# Pressed Steel Car Company *v.* Standard Steel Car Company, Appellant.

*Equity—Injunction—Mandatory injunction—Wrongful use of blue prints and drawings.*

Where a car manufacturing company delivers to its customers blue prints in connection with the orders for cars for the information and use of the purchasers as a necessary part of the transaction, and also for their use in ordering repair parts, and the customers deliver the blue prints to a rival car manufacturing company so that the latter might use them in manufacturing and selling cars and car parts, the latter company will be compelled by a court of equity to surrender up such blue prints to the former company.

Argued Nov. 1, 1904. Appeal, No. 51, Oct. T., 1904, by The Standard Steel Car Company from decree of C. P. No. 1, Allegheny Co., June T., 1902, No. 554, on bill in equity in case of Pressed Steel Car Company v. John M. Hansen, C. S. Culverhouse, William Bierman and Standard Steel Car Company. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT, POTTER and THOMPSON, JJ. Affirmed.

Bill in equity for an injunction.

MACFARLANE, J., filed the following opinion:

1. The Pressed Steel Car Company is a corporation organized under the laws of the state of New Jersey, in the year 1899. It succeeded to the business theretofore carried on by the Schoen Pressed Steel Company. The company is now, and has been since its incorporation, engaged in a very large way in the manufacture of steel cars, car parts, bolsters, trucks and other similar railway equipment. Almost all of the parts of its cars are made of pressed steel and are produced from plates pressed or formed by dies. The company is the pioneer company in the manufacture of pressed steel cars, and prior to January, 1902, was the only company engaged in such manufacture in a commercial way. Prior to the formation of the defendant company, the plaintiff had also made about 1,600 structural steel cars. Its product of pressed steel cars was about one 100,000.

2. The Standard Steel Car Company is a corporation or-

ganized under the laws of the state of Pennsylvania in the month of December, 1901, and is also engaged in the manufacture of steel cars and car parts in competition with the plaintiff company, having completed the erection of a plant and begun the manufacture of cars about the month of August, 1902. The principal parts of the cars produced by it are made of structural material which does not undergo the process of pressing, but these cars have some pressed steel parts.

3. The manufacture of pressed steel cars and their parts requires great engineering and mechanical skill, and the construction of cars for use on the various railroads and the adaptation of them to the needs and wishes of the railroads require the constant designing of new cars and parts of cars, and the exercise of mechanical and engineering skill and ability, so as to meet the requirements of the various railroads. For this purpose the plaintiff company maintains an engineering department which is engaged in the designing of cars and the machinery for the manufacture of cars, and its expense in this respect alone is more than $100,000 per year.

4. In connection with the designing and construction of these cars the company prepares drawings or tracings showing the various parts of the cars to be built and how the different railway specialties and appliances can be successfully applied to cars which it manufactures. Blue prints of these drawings are sent to the railroad companies proposing to purchase cars so as to enable them to ascertain whether or not the cars which it is proposed to build will meet their requirements, each order of cars being specially designed to meet the particular requirements of the railroad for which they are built. During the manufacture of the cars copies of these blue prints are frequently furnished to the railroad companies for the purpose of inspecting the cars to see that they are built in accordance with the drawings. And after the cars are built and delivered, or contemporaneously therewith, blue prints of the cars are furnished to the railroads so as to enable them either to order parts necessary for repairing the cars or to make the repairs on the cars themselves. It is common practice with the railroads to order from the plaintiff company and keep in stock with their storekeepers a large number of such parts of the

cars as will most likely be needed for repairs, and for this purpose it has been customary to, and it is necessary that they should, have these blue prints.

All of the blue prints so sent out by the plaintiff company were sent out only in connection with the carrying on of its business in the manner and for the purpose stated and receipts for them were generally required to be given by the persons by whom they were obtained.

It was also the rule of the company that receipts should be given by its own officers for all prints sent out from the general offices.

5. In December, 1901, and probably as early as November, 1901, the defendant, Hansen, together with certain other persons who were employees of the plaintiff company, decided to organize a new company to engage in the manufacture of steel cars in competition with the plaintiff.

At this time Hansen was the chief engineer of the plaintiff company, the defendant, Bierman, was his secretary, and the defendant, Culverhouse, was chief clerk of the engineering department under Hansen.    Peter F. McCool, one of the incorporators of the new company, was superintendent of the McKees Rocks plant of the plaintiff; H. J. Gearhart, another incorporator of said company, was the auditor of the plaintiff company; G. H. Goodell was its assistant chief engineer; J. B. Brady was its general sales agent; W. O. Jacquette held an office and W. H. Shoen was its first vice president.

In pursuance of the decision of the said Hansen and others aforesaid in the month of December, 1901, an application was made for a charter for the defendant Standard Steel Car Company, which was granted, and on January 1, 1902, the said Hansen left the employment of the plaintiff company, and took charge, and became president, of the Standard Steel Car Company, which company immediately commenced to erect a plant for the manufacture of cars and to make preparations to manufacture cars therein, and some time in August, 1902, actually began to manufacture cars.

All of the persons mentioned above as employees or officers of the Pressed Steel Car Company left the employ of the plaintiff company and became associated with the Standard Company as employees or officers thereof.

6. The defendant company has received and has in its possession certain blue prints, designated in the list "Exhibit No. 4" which were made in the offices of the plaintiff company from its drawings and showing cars and car parts, and it has also a large number of blue prints made by different railroad companies from tracings or drawings made by these companies from blue prints furnished to them by the Pressed Steel Car Company, the latter prints for convenience, if not with strict accuracy, being termed in this case, copies, or "secondary prints." Just how far, if at all, these secondary prints vary from the plaintiff's drawings does not appear, but they are in most particulars reproductions of plaintiff's drawings and show cars and car parts substantially of the character and design manufactured, or proposed to be manufactured, by the plaintiff company for the said railroad companies. The blue prints in controversy here, are die prints and construction prints, the latter being originals and copies, and, in addition, some blue prints of bills of material referred to in paragraph eight of these findings.

7. The defendant company never received or had in its possession and the defendant, Hansen, did not nor did any of the other defendants at any time have in their possession, any dies, print or prints showing the essential features of dies used by the plaintiff, except that some such drawings were in the possession of the defendant Hansen when he was an officer of the plaintiff company, but no such prints were removed by him or any of the other defendants from the plaintiff's premises.

8. The defendant, Culverhouse, as admitted by his answer, ordered and had delivered to him, just prior to his leaving plaintiff's employment, certain blue prints of bills of material of the plaintiff company which remained in his personal possession until they were produced in court and placed in the custody of the prothonotary. These prints were so procured and retained by the said Culverhouse without the knowledge or connivance of any of the other defendants. These prints are the property of the plaintiff company, and in the findings and opinion are always referred to as bills of material or blue prints of bills of material.

9. None of the blue prints, originals or copies, were pro-

cured by the defendants, or any of them, from the plaintiff company, but the originals had been sent by that company to railroad companies and one individual. And, first, the original prints in the possession of the defendant company, except the W. H. Miner prints, had been sent to the railroad companies in connection with orders for cars made by the Pressed Steel Car Company for the railroads for their information and use, as a necessary part of the transaction, and also for their use in ordering repair parts. There was no expressed limitation on the part of the Pressed Steel Car Company as to the use to which the prints should be put, and no expressed restriction placed upon the ownership. Such are the cases of the Central Railway of New Jersey, the Northern Pacific Railway and the Great Northern Railway. The purpose was, however, understood by all parties. The prints sent to the Central Railway of New Jersey were used by their car inspector, A. Christianson, in the inspection of the cars during the progress of manufacture, and, upon his becoming an employee of the Standard Car Company, he delivered them to that company early in the year 1902. He never owned these prints and had no authority from the Central Railway of New Jersey to so dispose of them. The Great Northern Railway prints were sent by that company to the Standard Company in June, 1902, under an agreement to return them. The Northern Pacific prints were delivered to the Standard Company without restriction.

Prints had been sent by the Pressed Steel Car Company to W. H. Miner, a manufacturer of a draft rigging for cars, for his use in adapting and applying the rigging to cars made by that company. At the request of the defendant company, he sent them to it for the information of its officers in the matter of adapting the rigging to its cars and he gave them the option of retaining them, which they have elected to do; and second, the copies or secondary prints, of which there is a large number in the possession of the defendant company, were, as hereinbefore stated, made from original blue prints sent by the Pressed Steel Car Company under the circumstances stated. The copies were sent to the defendant company for its information and, in some instances, in connection with negotiations for contracts for the manufacture of cars, or after orders had

been given by them. These prints, both originals and copies, are of great value and use to the defendant company, and their possession by it is a damage to the interests of the plaintiff company.

10. The number of these copies of prints is so great that an investigation at the trial of the circumstances of each was a practical impossibility, but these findings are sufficient to raise the questions at issue.

Aside from the blue prints of bills of material, produced by Mr. Culverhouse, which are the property of the plaintiff, we have presented the question whether the prints and copies of prints in the possession of the defendant company become the absolute property of the parties to whom the plaintiff sent them, so that they had the right to deliver them, or copies of them, to a rival company, or whether, under all the circumstances, a court of equity should protect the plaintiff and give it relief.

Counsel for the plaintiff succinctly state their position as follows: "There is no contention on the part of the plaintiff that there was any express agreement with the person to whom the prints were sent that they should be used only in a particular way, but certainly the absence of such restriction does not under the circumstances in this case prove the presence of an understanding or agreement that the prints should be taken by the railroad companies and delivered to a rival concern for the purpose of enabling it to compete with the plaintiffs.

"What we do contend is that in the sending out of such prints in the manner shown in this case for the purpose of business transactions between the railroad company and the car company, there was implied an agreement that their use should be limited to purposes naturally arising from the business relations existing between the parties; and especially that there was an implied agreement that they should not be given to a rival company for the purpose of enabling it to compete with the plaintiff; and that the furnishing by the railroad company to the Standard Company of prints obtained under such circumstances is a gross breach of confidence.

"We therefore contend that we are entitled to an injunction here upon the ground (1) of a property in the designs

shown by these prints and in the prints themselves; and (2) that the surrender of these prints to the Standard Company, if done with the consent and approval of the person to whom they were delivered by us, was such a gross breach of good faith and confidence as entitles us to relief at the hands of a court of equity."

The industry of counsel and our own examination has failed to find any decision of any Pennsylvania courts ruling this proposition. In a great manufacturing community like ours, this, or a similar situation, frequently arises. An engineering and contracting concern negotiates for the erection of a furnace or large steel plant, sends to the proposed customer blue prints of drawings, which are the results of years of study and experience and have been produced at a large expense, and an offer is made to construct the plant at a certain price. The purchaser sends either the prints, or copies of them, to a competing contractor and solicits his bid, thus giving him the benefit of the skill, experience and pecuniary outlay of the other. Or the rival solicits the loan of the blue prints for its own information, or for its use in bidding against the one whose designs are acceptable.

This case, however, affords an excellent illustration. The chief engineer of the Pressed Steel Car Company promotes a company to enter into competition with his employer. Immediately upon the formation of the new concern, a large number of the employees, in various departments of the old, leave and enter the employment of the new. They bring with them, as is their undoubted right, the skill and experience gained while working for the pioneer company. This would enable the new company to avoid many of the expensive experiments and mistakes of the old, and these engineers and draftsmen, with their knowledge of the construction of the cars and of the method of manufacture, according to their own testimony, should have been able to measure the cars made by the company and to produce in a short time detailed and practical drawings from which the cars could be constructed. They did not do this, for the very obvious reason that blue prints of drawings were available and were accurate. It is idle to say that these drawings are of no value, or of little value. The railroads to whom the Pressed Steel Car

Company had furnished cars sent the blue prints furnished to them to the new company, naturally welcoming the advent of competition likely to reduce prices, or some complaisant subordinate, or even head of a department, assists a new company to obtain the results of the experiments of the old in a shape, that, at a glance, conveys more information to an engineer, and particularly the engineer who made the drawings, than would the reading of a descriptive book or the examination and measurement of many cars. This may be "good business," but the element of unfairness in the transaction forcibly strikes the mind.

It is argued that these prints were obtained by the defendant company in the "ordinary course of business" and we are asked to make this a finding of fact. The expression is too indefinite for such use. In some instances, the railroads, having obtained from the Pressed Steel Car Company cars, which exactly, or with some modifications, suited their requirements as to size and character, gave to the Standard Company copies made by them, which would show their requirements. The Standard could then modify the construction from pressed steel to structural steel, or if the car furnished by the Pressed Steel Car Company was a structural steel car, the Standard Company knew the exact needs of the customer. Such a transaction is in the course of a business negotiation or contract, but to call it "in the ordinary course of business" would not necessarily justify it. We have here, generally speaking, one set of facts, where the defendant company moves to get an advantage over its rival and obtains its information from that rival's actual or possible customers, and the other, where the customer makes the move for its own advantage and uses the information placed in its hands.

On the other hand, the Pressed Steel Car Company has from the necessities of its business, or through a feeling of security, caused by the fact that it was alone in the field, placed its designs in the hands of its customers and has not exacted any agreement as to their use, has not marked on the prints "the property of the Pressed Steel Car Company," and never said in so many words that the prints themselves, or copies, must not be given to a competitor.

That a court of equity has, in a proper case, jurisdiction to

decree the return of drawings and copies thereof, was decided in 1849, in the case of McGowin v. Remington, 12 Pa. 56. Remington, intending to leave Pittsburg, where he had for many years been a surveyor and regulator and had a large collection of drafts and plans and desiring to assist McGowin, who had been his pupil and proposed to follow the same business, left in his custody and care for the mere purpose of promoting McGowin's interests and business, all of the plaintiff's plans and drafts to be used until Remington should require them. This was a loan, a bailment and not a sale or gift of the articles. This case recognizes the principle frequently asserted by courts of equity, that there is a property in the design, in the idea, and in the mental conception, as well as in the piece of paper on which it is expressed. Says the court: "If we add the fact that some of these documents are the original work of the plaintiff, of value as being predicated upon data possibly no longer accessible, a wrong is perpetrated which a chancellor ought not to hesitate in relieving." There was here a breach of confidence, as well as a refusal to return bailed property. The effect of the decree requiring the delivery of the copies is that Remington, now returned to Pittsburg to resume his old occupation, is entitled not only to his plans, but that his competitor shall not have the permanent advantage of the information contained in those plans. The plots were loaned to McGowin for his information and assistance in promoting his business, yet he is denied the use of copies.

That the Pressed Steel Car Company had an exclusive property in the drawings in its offices, and no one, whether draftsmen or other employee, had any right to have blue prints made for his own use or the use of others. It matters not that the parts of the cars were not protected by patents and that the process of manufacture was not a secret one. A certain amount of publicity is unavoidable in any manufactory, but an unlocked door is not an invitation to the passer-by or to the servant of the household to help himself. Neither does a manufacturer abandon his property in a design by delivering it or a copy to another for a restricted purpose, nor by a limited publication. His property rights will be protected in such cases, and he will be protected against a breach of trust, confidence or contract, and, especially, will he be protected against

a breach of the confidence existing between employer and employee.

These principles are supported by a number of well-considered cases. On the rights of an employer against an employee, the following cases, cites in the plaintiff's brief, are in point: Lamb v. Evans, L. R. (1892) 3, Chan. 462, where canvassers, employed to obtain advertisements for the plaintiff's trades directory and to supply him with blocks and materials necessary for producing the advertisements, were held to have no right to use these blocks and materials for the purpose of a rival publication. The court cites a case where a cutter, in the employment of a tailor, was enjoined from using copies of customers' patterns made by him before he left his master.

Lewis v. Smellie, 73 Law Times Rep. 226, a solicitor's clerk copies the register and index of agents and firms used by the plaintiff in process serving and started to use them in a rival business and was enjoined. Merryweather v. Moore, L. R. (1892) 2 Chan. 518, a clerk to a firm of engine makers compiled a table of dimensions of various types of engines for his use in the service of a rival concern. Held to be a breach of his implied contract arising from the confidence that a servant shall not use, except for the purpose of service, the opportunities which that service gives him of obtaining information. The court said: " It is quite clear that, independently of any question as to the right at law the court of chancery always had an original and independent jurisdiction to prevent what that court considered and treated as wrong, whether arising from the violation of an unquestionable right or from breach of contract or confidence. . . . Perhaps the real solution is that the confidence postulates an implied contract that where the court is satisfied of an existence of the confidential relations, then it at once infers or implies the contract arising from that confidential relation." The abuse of the confidence, necessarily arising out of the circumstances, is the ground of the injunction.

It is hardly necessary to cite authority for deciding that the bills of material must be returned to the plaintiff, under the facts found in paragraph eight. The excuse for taking them was that it was customary for draftsmen to make blue prints of their work and to retain them for their own use. If there

be such a practice, it is a reprehensible one. The principles underlying these cases have, however, a bearing upon the question of the other prints, viz : A breach of the confidence necessarily arising out of the relation between the parties, that relation raising an implied contract. Broadly stated, it is that a court of equity will not permit anyone to take an unfair advantage of a position in which he has been placed through any relation of confidence and trust, or, we think, through the necessities of, or as an incident to, a contract. A familiar example is that of an architect's plans. The form of contract used generally throughout the United States provides that the plans belong to the architect, and shall be returned to him upon the completion of the building. In the absence of such a stipulation, should a contractor be allowed to use in the construction of other buildings plans and specifications furnished him by an architect in connection with and as a necessary part of the builders' contract with the owner by whom the architect was employed? Or, should he be permitted to turn them over to another architect for his use? And, if the owner asks for blue prints so that he may inspect his building during construction for his pleasure and information, or for the purpose of making some alterations and additions, would not his act in using them to obtain bids from other architects be considered by all right-minded people a breach of decency and honorable dealing? Courts of equity do not enforce abstract principles of ethics, but this is something more. If the builders or the owners should be enjoined from using designs so obtained, equally so should the architect, who unfairly and improperly receives information, however properly obtained by another. We think this case is ruled by the same principles, unless the method of the publication and the circumstances of the case amount to an abandonment of the special rights of the plaintiff, unless there was an absolute, unrestricted gift of the prints, giving the railroad companies a title not only to the prints but to the design, so that they had a right to use them, or to give them to others, for the purpose of constructing cars.

It is undoubted that there may be a publication of a book, a piece of music or a picture without an abandonment of the author's or artist's property rights. A student of a system of bookkeeping who was permitted by the teacher to copy

notes of the lectures was not permitted to publish them.  Such use was not in contemplation of the teacher.  The publication of a book for private circulation is not an abandonment of the author's rights.  At common law, the author of a manuscript might obtain redress against one who had surreptitiously got possession of it.  An inventor does not lose his rights unless he suffers his invention to go into public use without objection.  It is a question of intent as to the extent of the license: Bartlette v. Crittenden, 4 McLean, 300.  The exclusive right to one to make reproductions of a picture does not justify another to make and sell photographs: Oertel v. Wood, 40 Howard's Prac. 10.  So the exhibition of a blue print of machinery in a frame in the office of the purchaser, although done by permission of the manufacturer, a copy of whose drawing it is, certainly is not a general publication and an abandonment of exclusive rights in the drawing.  The furnishing of a dozen such prints so that the employees of the purchaser may become thoroughly conversant with the construction and operation of the machinery, is a limited publication.  When the Pressed Steel Car Company permitted its customers to have blue prints, it did not give them the right to a use which was not in the contemplation of both parties, and which would give an unfair advantage to a competitor.

We have discussed this case to so great a length on account of the importance of the principles involved.

### CONCLUSIONS OF LAW.

1. The defendant, the Standard Steel Car Company, is not entitled to the possession of the original blue prints of the Pressed Steel Car Company's cars and car parts, and must deliver them to the plaintiff.

2. The blue prints of bills of material now in the hands of the prothonotary are to be returned to the plaintiff.

3. All copies or tracings of drawings or of blue prints of drawings of the Pressed Steel Car Company are to be delivered to the plaintiff whether the said copies have been made by the defendants or by third parties.  For the purpose of identifying these copies and of ascertaining the necessary facts there should be a reference to an expert or examiner, unless the parties can agree to some other method of ascertaining the facts.

Let the decree be drawn in accordance with the foregoing and enjoining the defendants from using any of the blue prints or copies thereof. The defendant, the Standard Steel Car Company, to pay the costs.

A decree was entered in accordance with the opinion.

*Errors assigned* were various findings and conclusions, and the decree of the court.

*William Scott,* of *Dalzell, Scott & Gordon,* with him *Clarence Burleigh,* for appellant.—The blue prints in question do not relate to matters which were the exclusive property of the plaintiff so as to be within the rule as to trade secrets or literary property. Even if these blue prints could be held to be trade secrets or literary property of the plaintiff, the evidence does not warrant the finding that their delivery by the plaintiff was otherwise than absolute and unconditional, and without limitation or restriction as to their ownership or use: Bristol v. Equitable Life Assurance Society, 132 N. Y. 264; (30 N. E. Repr. 506); Keene v. Wheatley & Clarke, 9 Am. Law Reg. 33; Gendell v. Orr., 36 Legal Int. 412; Wright v. Eisle, 86 App. Div. 356; 83 N. Y. Supp. 887; Rees v. Peltzer, 75 Ill. 475; Oertel v. Wood, 40 How. Pr. 10; Palmer v. DeWitt, 47 N. Y. 532; Oertel v. Jacoby, 44 How. Pr. 179. Even upon the plaintiff's contention this proceeding, under the findings and decree of the court, affects the property rights of persons who are not before the court.

*James H. Beal,* of *Reed, Smith, Shaw & Beal,* for appellee.— The transaction between the appellee and the railroad receiving the prints certainly was not a sale, nor was it a gift. There is nothing in it to suggest that the railroad company acquired the property in the blue print itself, much less in the design shown by the print. What took place was a delivery by the appellee to the railroad company of these prints for the purpose of a business transaction between the parties. It was done so that the prints might be used in connection with that transaction. It was for that purpose that the railroad company received the prints. We submit that this constitutes a bailment and nothing else, and that the railroad company had

no right whatever to transfer these prints to anyone else, especially not to a business rival: McGowin v. Remington, 12 Pa. 56; Dock v. Dock, 180 Pa. 14; Oertel v. Wood, 40 Howard's Pr. 10; Keene v. Wheatley, Fed. Cases, 7644; Bartlette v. Crittenden, 4 McLean, 300; Prince Albert v. Strange, 1 Macnaughten & Gordon, 24; Lamb v. Evans, L. R. (1892) 3 Ch. 462; Lewis v. Smellie, 73 Law Times Rep. 226; Merryweather v. Moore, L. R. (1892) 2 Chan. 518.

OPINION BY MR. JUSTICE MESTREZAT, December 31, 1904:

The very elaborate opinion of the learned trial judge renders unnecessary an extended review of the questions involved in this case.   We are satisfied that the evidence fully justifies his findings of fact and we are equally well convinced that his conclusions of law on the facts are correct.   The drawings or tracings of the parts of the cars and the blue prints, except the " secondary prints," were made by the appellee company to be used in connection with, and were necessary for, carrying on the business in which the company was engaged.   The court finds as follows : " In connection with the designing and construction of these cars the company prepares drawings or tracings showing the various parts of the cars to be built and how the different railway specialties and appliances can be successfully applied to cars which it manufactures.   Blue prints of these drawings are sent to the railroad companies proposing to purchase cars so as to enable them to ascertain whether or not the cars which it is proposed to build will meet their requirements, each order of cars being especially designed to meet the particular requirements of the railroad for which they are built.   During the manufacture of the cars copies of these blue prints are frequently furnished to the railroad companies for the purpose of inspecting the cars to see that they are built in accordance with the drawings.   And after the cars are built and delivered, or contemporaneously therewith, blue prints of the cars are furnished to the railroads so as to enable them either to order parts necessary for repairing the cars or to make the repairs on the cars themselves.   It is common practice with the railroads to order from the plaintiff company and keep in stock with their storekeepers a large number of such parts of the cars as will most likely be needed for repairs,

and for this purpose it has been customary to, and it is necessary that they should, have these blue prints.

All of the blue prints so sent out by the plaintiff company were sent out only in connection with the carrying on of its business in the manner and for the purposes stated and receipts for them were generally required to be given by the persons by whom they were obtained."

The drawings and blue prints in controversy were, therefore, not sold or given to the railroad companies but were the property of the plaintiff and made by it for the purpose of carrying on its business and were sent out in connection with the business of the company. Part of these blue prints were sent to the three railroad companies in connection with orders for cars made by the plaintiff company for the railroads but as found by the court only "for their information and use, as a necessary part of the transaction, and also for their use in ordering repair parts." The remainder of the prints were sent by the plaintiff to one W. H. Miner, draft rigging manufacturer, for his use in adapting and applying the rigging to cars made by the plaintiff company. Notwithstanding the fact that these prints were delivered by the plaintiff to the parties for the purpose stated in the finding of the court, they delivered them to the defendant, a rival company, which is now making use of them in carrying on a competing business. While there was no expressed restriction placed on the ownership of the prints or any expressed limitation as to the use to which they were to be put, it is clear, as observed by the trial court, that the purpose for which they were delivered by the plaintiff was understood by all parties. The facts of the case warrant no other conclusion. There is no evidence to sustain the contention that the delivery of the prints by the plaintiff to the railroad companies was absolute and unconditional. As suggested above, there was no expressed agreement on the subject, but the facts clearly support the finding of the trial court that the prints were sent in connection with the orders for cars for the information and use of the purchasers as a necessary part of the transaction, and also for their use in ordering repair parts. The blue prints therefore remained the property of the plaintiff after delivery to the railroad companies, whose use of them was restricted to the purpose for which they were delivered, and a chan-

cellor will sustain a bill to enjoin the use of them for another purpose by the railroad company or the defendant company to which, without the plaintiff's consent, they were delivered.

We see no grounds whatever upon which the appellant can claim ownership in the prints or the right to use them in its business of manufacturing and selling steel cars and car parts in competition with the plaintiff. It is not pretended that the defendant company paid any consideration for them to the plaintiff or to the companies from which it received them. The right to hold them as against the plaintiff is based simply on the fact that the prints were delivered to the defendant company by the railroad companies so that they might obtain their cars and car parts from the defendant instead of the plaintiff and thus by the use of the plaintiff company's own designs enable them to give their trade to its rival competitor. In other words, the prints which had been delivered to the railroad companies to enable them to purchase and use the cars and car parts manufactured by the plaintiff were delivered by the railroad companies to the defendant company so that the latter might manufacture and sell cars and car parts from designs and drawings which had been prepared by the plaintiff for exclusive use in its own business. This was clearly a violation, not only of the property rights of the plaintiff in the prints but also of the trust and confidence with which they were received by the railroad companies. This unauthorized act and breach of confidence resulted in great advantage to the appellant and loss to the appellee. The court finds that "these prints, both originals and copies, are of great value and use to the defendant company, and their possession by it is a damage to the interests of the plaintiff company." These facts will, on reason and authority, as shown by the learned trial judge, confer jurisdiction on a court of equity which will restrain the defendant company from making use of the prints in its business and give such other and adequate relief as the rights of the injured party may require.

The persons, other than the plaintiff and defendant, who may have an interest in the prints are not before the court and are not complaining of the decree. Their right to the property in question may be adjudicated when they invoke the aid of the court for that purpose.

The decree of the court below is affirmed.