DATA GENERAL CORPORATION, a Delaware Corporation, Plaintiff,

v.

DIGITAL COMPUTER CONTROLS, INC., a Delaware Corporation, Defendant.

Court of Chancery of Delaware, New Castle County.

Submitted Sept. 12, 1975.

Decided Nov. 7, 1975.

Andrew B. Kirkpatrick, Jr., Douglas E. Whitney and William T. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Reavis & McGrath, New York City, for plaintiff.

Louis J. Finger, of Richards, Layton & Finger, Wilmington and Richard F. Horowitz, of Weiss, Rosenthal, Heller & Schwartzman, New York City, for defendant.

MARVEL, Vice Chancellor:

Plaintiff and defendant compete in the business of designing, manufacturing and marketing compact digital computers, commonly known as minicomputers, one of a family of electrically activated mechanical counting devices, the functions of which are based on the principles of binary algebra, the ancient art of computing by machine having been vastly speeded up and made more elaborate and sophisticated

through the application and regulation of electrical impulses. Minicomputers appear to have become increasingly popular since their introduction some ten years ago by Digital Equipment Corporation,[1] having come to fill the need of large food stores as well as those of many other businesses, in which a close check of inventory is required for a relatively small but efficient computer which can be easily moved about, integrated into other compatible equipment, and at the same time made to perform many of the functions of a large and cumbersome conventional computer.

Plaintiff complains that having developed the Nova 1200 in the late 1960's, its most sophisticated and most rapidly operated of a highly successful line of similar but less refined and compacted minicomputers, for the protection of the design of which (except by copying the device itself through legally permissible reverse engineering or other analysis of the object or device in issue, *Smith v. Chanel, Inc.* (CA9) 402 F.2d 562 (1968)) adequate precautions were taken, that defendant, in the spring of 1971, in alleged violation of not only the law of trade secrets[2] and of common law copyright but also of the principle that a proprietary idea may not be lawfully appropriated, wrongfully made use of drawings which disclosed the design of the Nova 1200, which drawings were intended to be used solely by plaintiff's customers, vendors, licenses, and trainees for the general maintenance as opposed to the manufacture of such machine. Defendant having allegedly copied such maintenance

drawings, plaintiff goes on to claim that defendant then used them for the improper purpose of designing and making a substantially identical computer,[3] which it named the D–116. It is further contended by plaintiff that the continuing manufacture and sale of the D–116 by defendant has constituted and continues to constitute actionable unfair competition entitling plaintiff to injunctive relief and damages.

Plaintiff having been denied a preliminary injunction[4] against the alleged pirating by defendant of plaintiff's alleged trade secrets contained in the maintenance documents of the Nova 1200, now seeks after trial the granting of permanent injunctive relief as well as damages. Defendant, having been denied summary judgment of dismissal[4] of the complaint, now asks that final judgment be entered in its favor on the ground that it has been demonstrated that the Nova 1200 is susceptible of being built by reverse engineering within a period of two months; that, in any event, the design disclosed in the drawings of the Nova 1200 obtained by defendant from a customer of plaintiff is not sufficiently novel to be subject to protection under any principle of unfair competition, and that finally, assuming that the design of plaintiff's Nova 1200 contains protectible trade secrets, plaintiff took inadequate precautions to protect the secrets allegedly contained in its Nova 1200, claiming that as a result of plaintiff's relatively unrestricted and uncontrolled distribution of copies of its Nova 1200's logic design among customers, third party users, ven-

1. It is contended by defendant, however, that the parentage of the minicomputer can be traced back to the design of the Whirlwind I, which was built some twenty-five years ago.

2. According to the Restatement of Torts § 757 comment b.: "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives an opportunity to obtain an advantage over competitors who do not know or use it."

3. According to plaintiff, defendant, through the use of a copy of maintenance documents

containing the design of the Nova 1200, was able to design a device which was (a) compatible with peripheral equipment designed for the Nova 1200, (b) the subassemblies of which were interchangeable with those of the Nova 1200, and (c) capable of playing any program composed for the Nova 1200.

4. *Data General Corporation v. Digital Computer, Inc.*, Del.Ch., 297 A.2d 433 (1971) aff'd, Del.Supr., 297 A.2d 437 (1972).

dors, and trainees, that almost six thousand persons[5] had had access to such drawings, as of the time of trial of this case.

Citing the practice of International Business Machines, which manufacturers and markets on the average approximately the same number of minicomputers as plaintiff, defendant argues that plaintiff, having allegedly made a comparable wide distribution of documents containing the design of the Nova 1200, it must look solely to its sustainable patents for protection against competition in the field.

There are as of now approximately fifty competing minicomputer manufacturers, a field which is rapidly expanding. Thus, while in 1968 3600 minicomputers were sold, it is estimated that a total of 50,000 will have been sold during the calendar year ending December 31, 1975. And it is projected by an expert, namely a department of Morgan Stanley & Co., that during the period 1980–1981, 900,000 minicomputer units will have been sold. Over the years since 1965 the growth in the minicomputer industry has been accompanied by a steady refinement in sophistication of design and in technical performance, accompanied by a reduction in price, which improvements stem from the development of more efficient logic design and engineering, resulting in higher-scale integration of circuit elements, the elimination of redundant circuit boards by the substitution therefore of a relatively few, large, printed circuits, and a general adoption of high packaging density. Such progress in the minicomputer field is exemplified by the development during plaintiff's fiscal year 1970–1971 of its 16-bit Nova 1200, an improvement on earlier models of similar construction insofar as boards, memories, and instructions are concerned. However,

the Nova 1200's logic design differs radically from that of earlier Novas, and its speed is approximately twice that of the original Nova. Thereafter, such computer rapidly became one of the two most popular 16-bit minicomputers on the market, the other being the PDP–11 manufactured by Digital Equipment Corporation, the pioneer in the minicomputer field.

Defendant's president, Mr. Ackley, having concluded early in 1971 that plaintiff's Nova 1200, which he recognized as a fine design, was the most likely 16-bit computer on which to base his proposed design for a similar machine to be made available as a competitive second source for those needing the services of a Nova 1200 type computer, decided on the acquisition of a Nova 1200 as a logical means of acquiring knowledge about such device. Accordingly, in March, 1971, Mr. Ackley communicated with an original equipment manufacturer active in the computer field, namely Minicomputer Systems, Inc., which, he had learned, had recently acquired a Nova 1200 from plaintiff, and placed an order for such device. Mr. Ackley testified that he ordered the machine in question from Minicomputer rather than from plaintiff because of a desire for prompt delivery, having anticipated delays in delivery of such equipment if ordered from plaintiff.

Meanwhile, on April 7, 1971, prior to delivery to defendant of the Nova 1200 by Minicomputer Mr. Ackley visited the latter's offices in Scarsdale, New York, for the avowed purpose of obtaining a maintenance manual containing diagrams disclosing the design of the Nova 1200, a document which customarily accompanies such equipment on its sale, the stated purpose behind the furnishing of such drawings by plaintiff being to enable a purchaser to

---

5. However, according to plaintiff, as of the time of the alleged copying of plaintiff's logic drawings for the Nova 1200 in April 1971 only eighty sets of such drawings had been so distributed and dissemination is not significant if in confidence. See 2 Callman,

Unfair Competition, Trademarks & Monopolies § 53.3(d) (1968), and Compare *Board of Trade v. Christie*, 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031 (1905) and *Pressed Car Co. v. Standard Steel Car Co.* (Supr.Ct.Pa.) 210 Pa. 464, 60 A. 4 (1904).

perform his own maintenance [6] of a Nova 1200 in lieu of being required to return such device to plaintiff for repair or to become dependent on a special outside maintenance crew, prompt repair of a computer, as in a hospital, being often a necessity. As a result of such visit, on which he was accompanied by an investment banker (Minicomputer allegedly being at the time in financial straits) Mr. Ackley acquired a copy of such maintenance drawings, which he then took to his own corporate facilities in New Jersey where he had them photographically copied. Later, additional diagrams were forwarded to defendant by Minicomputer, and more were delivered when additional equipment was later shipped. After the original set of drawings acquired on April 7, 1971 were copied in defendant's plant in New Jersey, they were returned to Minicomputer at the latter's request.

Such drawings bore a proprietary notice or legend [7], and the machine itself was accompanied by a standard form of contract which incorporated by reference a confidentiality agreement limiting the use of such drawings to maintenance, as opposed to manufacture, which was stated to be forbidden without plaintiff's consent in writing.

Furthermore, in the fall of 1970 at a chance meeting with plaintiff's president, Mr. deCastro, at a trade show in Houston, Texas, Mr. Ackley had disclosed his basic plan for manufacturing a second source of the Nova 1200 by designing a similar competing computer. In response to such announcement, Mr. deCastro replied that if Mr. Ackley pursued such a plan, plaintiff would sue him. Mr. Ackley thereafter allegedly consulted his attorneys, and early in April 1971 when he next encountered Mr. deCastro, again at a trade show this time in Atlantic City, New Jersey, Mr. Ackley significantly inquired about the possibility of obtaining a license to manufacture the Nova 1200 as at least two other computer manufacturers had done, namely Rolm and Nippon, a Japanese company, following up such inquiry with a letter. And, while vague at trial as to his comprehension of the proprietary notice or legend affixed to the Nova 1200 maintenance drawings which he had acquired from Minicomputer, his earlier deposition testimony discloses an awareness of the purpose and meaning of the legend affixed to the drawings in issue as well as a knowledge that the maintenance drawings for the Nova 1200 were intended, as might be expected, to be used solely for maintenance and not for the purpose of manufacturing a competing piece of equipment, a practice recognized by defendant and employed in its own business for the purpose of protecting its proprietary interest in its own D–112 logic designs, at least until this litigation had been instituted express recognition of defendant's property rights in its D–112 design having been required by the defendant of its vendor, Ampex.

The desired drawings having been obtained, the task of developing a computer functionally equivalent to the Nova 1200 was then assigned by Mr. Ackley to a Mr. Lavitola, who for the most part did the engineering work which evolved into the development and manufacture by defendant of the D–116, a minicomputer, which is, I am satisfied, substantially identical in design [8] with the Nova 1200. And I am

---

6. A computer consists of hundreds of integrated circuit chips located on circuit boards connected by wires. In carrying out maintenance by means of appropriate documentation, a broken wire or chip may be traced through the logic drawings and when found, repaired.

7. "This drawing and specifications, herein, are the property of Data General Corpora-

tion and shall not be reproduced or copied or used in whole or in part as the basis for manufacture or sale of the items without written permission." PX 31.

8. A practical difference is an improved reset button on the D–116. It also has greater memory capacity than the Nova 1200.

also satisfied that in order for Mr. Lavitola to complete his assigned task of incorporating the basic design of the Nova 1200 into the D–116 it was necessary for him to trace the drawings of the Nova 1200. In other words Mr. Lavitola did not, as originally indicated at the inception of this litigation, merely glance [9] at the Nova 1200 drawings from time to time but in fact copied them and then used them to design the D–116.

Accordingly, the basic issues to be decided are whether or not the logic design of the Nova 1200 found in plaintiff's maintenance documentation constitutes trade secrets, and, if so, whether or not plaintiff took adequate steps to keep such secrets from becoming public property and thus free as air by failing properly to restrict and restrain their distribution. Compare *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973).

■ First of all, I am satisfied that plaintiff has developed and recorded in its logic drawings of the Nova 1200 concepts of a sufficiently novel nature to entitle each such design drawing to have been a trade secret as of the time of its conception, which property right, if shown to have been adequately withheld from general circulation and thus not freely published, may be, upon a proper showing, protected from unauthorized duplication and use although, of course, an imitator is always entitled to copy a device containing alleged trade secrets through a process of reverse engineering in which the use of protected design drawings are not employed, *Smith v. Chanel, Inc.*, supra.

■ Upon the sale and delivery of a Nova 1200 plaintiff's practice has been to deliver with each such machine, whether the buyer be an original equipment manu-

facturer or an end-user, a complete set of maintenance drawings containing the Nova 1200's logic design. And while other documents, such as a user's and a maintenance manual, promotional articles and brochures of a technical nature as well as advertising have been made generally available by plaintiff to its various established and would-be customers, trainees and vendors, and fallen into the hands of others, I am satisfied that such other documents do not contain sufficient logic design of the Nova 1200 to permit their being successfully used for the purpose of either duplicating such machine or in assembling a computer substantially identical to the Nova 1200. In other words use of the complete design of such device, which is found in plaintiff's maintenance documentation, is necessary in order for a person to recreate a simulacrum of the Nova 1200 from its existing documentation rather than through reverse engineering. However, each logic diagram made available to Data General's customers and others, including vendors and trainees, bears a legend, as noted above, clearly stating that such drawings are not to be used for manufacture or sale of the items disclosed without written permission. And I am satisfied by his deposition testimony, which was taken long before trial and not long after the acquisition of the Nova 1200's logic design by Mr. Ackley in April, 1971, that the latter not only read such legend but comprehended its purpose. Other precautionary measures of Data General designed to protect its alleged proprietary interest in its logic drawings of the Nova 1200 involved the use of standard forms of sales agreements, one being applicable to sales to original equipment manufacturers and the other to sales to endusers. Both forms of such contract, as well as special contracts, contain a provision to the effect that plaintiff's standard terms

---

9. Neither the highschool team nor the special team hired by defendant prevailed in successfully reverse engineering the Nova 1200, although the highschool team apparently scored a theoretical 95%. The point is, however, defendant did not proceed by reverse engineering, *Franke v. Wiltschek* (CA2) 209 F.2d 493 (1953) and *International Industries v. Warren Petroleum Corporation* (D.Del.) 99 F.Supp. 907 (1951).

and conditions, as amended by the sales agreement itself, shall apply to any order filled in response to such an agreement, and a form of such standard terms and conditions, which contains a statement of the proprietory nature of the data furnished with a Nova 1200, including information as to their stated restriction to being used for the installation, testing, operation, and maintenance of the Nova 1200, is furnished to each customer entering into a sales agreement as a prerequisite to obtaining a Nova 1200. In fact, maintenance documentation containing logic diagrams is not furnished to a buyer until he has agreed, under the provisions of the sales agreement, to abide by the provisions of the proprietary legends. In addition, plaintiff takes customary precautions contractually to bind its employees to secrecy about its trade secrets, and while plant security does not compare with that of International Business Machines, guards are present at plaintiff's plant. Next, of course, all trainees must also sign a confidentiality agreement, and while additional sets of maintenance documentation for the Nova 1200 may be purchased for $100 each, such a purchase is tied into a requirement that the machine itself also have been purchased, a transaction which calls for the entry into a confidentiality agreement as to use of plaintiff's documentation. The only remaining classes of users of plaintiff's logic design, namely employees of customers and indirect customers not bound by specific contract against the use of plaintiff's documentation, except for maintenance, are, of course, on notice as to the prohibition against the proposed use of such drawings for competitive manufacturing of an identical device by reason of the aforesaid legend or notice affixed to each such document. And in the case of employees of customers there is a further guarantee of protection in that such person's employers are, of course, under contract not to disclose plaintiff's proprietary rights. Finally, I am satisfied that defendant's contention that plaintiff's other competitors have, in any event, widely used plaintiff's logic design is unsupported by the record, which shows that the only minicomputer manufacturer other than defendant which has without a license been charged with having made use of plaintiff's Nova 1200 logic design, namely M & M Computer, settled with plaintiff after suit was filed against it.

■ Having concluded that plaintiff has trade secrets reposing in the logic design of its Nova 1200, the next matter to be considered is whether or not such secrets are subject to protection by a state court of equity through the granting of injunctive relief and the award of damages in light of the decisions of the Supreme Court of the United States in *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco v. Day-Brite Lighting,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) and *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed. 2d 1249 (1967), which at their time of decision appeared to hold that once a novel device has been introduced into the stream of commerce, it is subject to being exploited by competitors except as protected by appropriate federal law, namely patent law, copyright law, or trademark law. In the later case of *Kewanee Oil Co. v. Bicron Co.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed. 2d 315 (1974) however, the Court made it clear that the field of state trade secret law is not preempted by federal law pertaining to patents in a case in which the majority of the Court protected a product under the law of trade secrets although it was probably patentable, stating:

"The subject of a trade secret must be secret, and must not be of public knowledge or of a general knowledge in the trade or business. *B. F. Goodrich Co. v. Wohlgemuth,* supra, [117 Ohio App. 493], at 499, 192 N.E.2d, [99], at 104. *National Tube Co. v. Eastern Tube Co.,* 3 Ohio Cir.Ct.R., N.S., 459, 462 (1902),

aff'd, 69 Ohio St. 560, 70 N.E. 1127 (1903). This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another 'in confidence, and under an implied obligation not to use or disclose it.' *Cincinnati Bell Foundry Co. v. Dodds,* 10 Ohio Dec. Reprint 154, 156, 19 Weekly L.Bull. 84 (Super.Ct.1887). These others may include those of the holder's 'employes to whom it is necessary to confide it, in order to apply it to the uses for which it is intended.' *National Tube Co. v. Eastern Tube Co.,* supra, 3 Ohio Cir.Ct.R., N.S., at 462. Often the recipient of confidential knowledge of the subject of a trade secret is a licensee of its holder. See *Lear, Inc. v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969)."

\* \* \* \* \* \*

"The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law. 'The necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world.' *National Tube Co. v. Eastern Tube Co.,* supra, 3 Ohio Cir. Ct.R., N.S., at 462. In *A. O. Smith Corp. v. Petroleum Iron Works Co.,* 73 F.2d [531], at 539, the Court emphasized that even though a discovery may not be patentable, that does not

> 'destroy the value of the discovery to one who makes it, or advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer.'

"In *Wexler v. Greenberg,* 399 Pa. 569, 578–579, 160 A.2d 430, 434–435 (1960), the Pennsylvania Supreme Court noted the importance of trade secret protection to the subsidization of research and development and to increased economic efficiency within large companies through the dispersion of responsibilities for creative developments.

"Having now in mind the objectives of both the patent and trade secret law, we turn to an examination of the interaction of these systems of protection of intellectual property—one established by the Congress and the other by a State— \* \* \*

\* \* \* \* \* \*

" \* \* \* Trade secret law and patent law have coexisted in this country for over one hundred years. Each has its particular role to play, and the operation of one does not take away from the need for the other. Trade secret law encourages the development and exploitation of those items of lesser or different invention than might be accorded protection under the patent laws, but which items still have an important part to play in the technological and scientific advancement of the Nation. Trade secret law promotes the sharing of knowledge, and the efficient operation of industry; it permits the individual inventor to reap the rewards of his labor by contracting with a company large enough to develop and exploit it. Congress, by its silence over these many years, has seen the wisdom of allowing the States to enforce trade secret protection. Until Congress takes affirmative action to the contrary, States should be free to grant protection to trade secrets."

On a finding that a trade secret exists, as I have found here, the law of Delaware is consistent with the above, *E. I. duPont de Nemours & Co. v. American Potash and Chemical Corp.,* Del.Ch., 41 Del.Ch. 533, 200 A.2d 428 (1964).

 Next, while I am of the opinion that trade secrets are entitled to protection " \* \* \* regardless of the supporting legal label \* \* \* *E. I. duPont de Nemours & Co. v. American Potash & Chemical Corp.,* supra, plaintiff, as noted above,

also relies for relief on common law copyright and the doctrine of misappropriation, variations in the avenues of relief available to the creator of a protectable proprietary idea, and am satisfied that as to common law copyright, which is recognized in Delaware, *Hughes Tool Co. v. Fawcett, Publications,* Del.Supr., 315 A.2d 577 (1974), plaintiff, for the reasons stated earlier in this opinion, did not in its limited distribution of maintenance documentation containing logic design for the Nova 1200, on the pages of which was affixed plaintiff's proprietary legend, generally publish and thus make public its common law copyright in its Nova 1200 logic design. A limited publication does not destroy common law copyright protection in that such form of publication only communicates the knowledge therein contained under express or implied conditions precluding its disclosure to the public, *Edgar H. Wood Association v. Skene,* 347 Mass. 351, 197 N.E.2d 886 (1964).

■ As to the claim of misappropriation, I am satisfied that it is more appropriately applied to outright pirating or palming off of a product as one's own, when it has in fact been produced by another, and is particularly applicable to the copying of news copy and recordings. Accordingly, while it will not be made a basis for the relief here sought, I am nonetheless satisfied that the rule of *International News Service v. Associated Press,* 248 U. S. 215, 39 S.Ct. 68, 63 L.Ed. 211, still applies in New Jersey, *Columbia Broadcasting System, Inc. v. Melody Recording, Inc.,* 134 N.J.Super. 368, 341 A.2d 348 (1975). See also *GAI Audio of New York v. Columbia Broadcasting System, Inc.,* 27 Md. App. 172, 340 A.2d 736 (1975).

■ As to the further contention that plaintiff can have no possible claim against defendant under the law of unfair competition from and after the disclosures contained in a patent involving the Nova 1200 which was issued on June 5, 1973, I am satisfied that the granting of such patent,

which related to the ALU of the device, was a disclosure of only one isolated functional part of the Nova 1200 and not of its design in general, the design of such part having been contained on one sheet of the Nova 1200's logic design documentation. Thus, the granting of such patent was not a full public disclosure making public plaintiff's total logic design of the Nova 1200.

■ As to the question of the state law to be applied in adjudicating plaintiff's claim of unfair competition, I conclude that notwithstanding the fact that a copy of the logic design documentation of the Nova 1200 was initially acquired by Mr. Ackley at the offices of Minicomputer in New York, such acquisition was not in itself improper under trade secret law because, despite a conflict in the evidence as to exactly how Mr. Ackley acquired such drawings, defendant, as the prospective owner of a Nova 1200, had the right to have such documentation for maintenance purposes. In other words, the improper use of such documentation, namely for the purpose of tracing the logic design of the Nova 1200, preliminary to designing the D–116 occurred in New Jersey, where defendant's plant and offices are located and where Mr. Lavitola's tracings of the Nova 1200's logic evolved into the design of the not only compatible but virtually identical D–116. Accordingly, the law of New Jersey, the place where the wrongful act of making what I have found to be an improper use by defendant of plaintiff's trade secrets applies in determining the nature and extent of the relief to be granted plaintiff, *Friday v. Smoot,* Del.Supr., 211 A.2d 594 (1965), and the fact that plaintiff has had its contract forms drawn so as to call for application of the law of Massachusetts in matters involving them is irrelevant.

■ As to plaintiff's right to relief, there is first of all a statute making it a misdemeanor for any—

"* * * person who * * * with an intent to appropriate a trade secret to his own use or to the use of another * * * (b) without authority makes or causes to be made a copy of an article representing a trade secret."

New Jersey Statutes Annotated § 2A:119-5.3. And it is entirely appropriate that civil relief be granted in carrying out a duly expressed state policy even though such policy is contained in a criminal statute, *Kewanee Oil Co. v. Bicron Corp.*, supra, and *Roofmasters, Inc. v. Robino-Ladd*, Del.Ch., Letter Opinion, (June 16, 1975).

In its opinion [10] of December 1971 in this same litigation this Court indicated that if plaintiff were to prevail at final hearing, it would only be entitled to permanent injunctive relief:

"* * * during that undetermined period of time which would be required for defendants [11] substantially to reproduce (to) plaintiff's device without its accompanying drawings."

■ The evidence of record is to the effect, however, that such reverse engineering was not accomplished or even undertaken ·by defendant for the purpose of designing and manufacturing a minicomputer substantially identical to the Nova 1200 and that the D-116 was in fact designed and thereafter manufactured through reliance on plaintiff's Nova logic documentation. See *Franke v. Wiltschek*, supra, and *International Industries v. Warren Petroleum Corporation*, supra. It is furthermore clear, in any event, as noted earlier in this opinion, that although apparently irrelevant under the authority of the above cited cases neither team engaged by defendant to reverse engineer the Nova 1200 after this action was filed succeeded in making a fully operable duplicate. Accordingly, a permanent injunction barring defendant from further use of both its Nova 1200 and D-116 logic drawings for the purpose of manufacturing a minicomputer substantially identical to the Nova 1200 will be granted, the form of relief normally granted to a plaintiff who has prevailed at final hearing, *E. I. duPont de Nemours & Co. v. American Potash & Chemical Corporation*, supra, and *Head Ski Co. v. Kam Ski Co.*, D.Md., 158 F.Supp. 919.

■ Finally, while evidence of damage suffered by plaintiff by reason of defendant's improper use of plaintiff's Nova 1200 logic design leading to the manufacture and sale of its D-116 was introduced at trial over the Court's protestations that in the interest of orderliness such issue should not be tried until it had been established that defendant was in fact liable to plaintiff under the law of trade secrets, I am now satisfied that not only because there is an absence from the record of basic evidence of such claimed damages in the form of books and records of original entry concerned with the manufacture and sale of the Nova 1200 as well as of the D-116, but for the further reason that plaintiff's claim is one for unliquidated damages as to which there is a wide difference as to the proper measure for determination of such damages, *Telex Corporation v. International Business Machines Corp.*, CA10, 510 F.2d 894 (1975), such issue should be referred to a jury sitting in Superior Court for its consideration and recommendation, *Scotton v. Wright*, 13 Del.Ch. 214, 117 A. 131 (1922), aff'd, Del. Supr., 13 Del.Ch. 402, 121 A. 69 (1923), and *Turek v. Tull*, 37 Del.Ch. 190, 139 A. 2d 368 (1958), aff'd, Del.Supr., 38 Del.Ch. 182, 147 A.2d 658 (1958).

An appropriate form of order on this opinion may be presented on notice.

10. *Data General Corp. v. Digital Computer Controls, Inc.*, Del.Ch., 297 A.2d 433 (1971) aff'd, 13 Del.Ch. 402, Del.Supr., 297 A.2d 437 (1972).

11. Mr. Ackley was a named defendant at the inception of this case.