GEORGE D. WRIGHT AND GEORGE HARVEY WRIGHT, trading as George D. Wright and Son,

Defendants below, Appellants,

*vs.*

GEORGE P. SCOTTON, GEORGE C. SCOTTON AND LYMAN J. SCOTTON trading as George P. Scotton & Sons, and also trading as Smyrna Nash Motors Company,

Complainants below, Appellees.

*Supreme Court, on Appeal, Jan.* 16, 1923.

Where defendant, the owner of a garage business, sold it to one of complainants with a covenant not to engage in a competitive business, and the purchaser formed a partnership to run the business purchased, the covenant inured to the benefit of the persons associated with the purchaser as partners, without the necessity of a formal assignment of the agreement.

Where a business is sold, and the seller covenants not to engage in a competitive business, the benefit of the covenant may be assigned with the business, and the assignee's rights will be protected, and any act of the covenantee which transfers the business and property also transfers or assigns the covenant.

Where defendant sold to one of complainants his garage business, and covenanted not to engage in a competitive business, complainant together with his partners in a firm formed after the purchase, were the proper parties to sue for a breach of the covenant.

Where a garage business was sold, and the seller convenanted not to engage in a competitive busines, that one of the partners of the purchaser withdrew from the firm before suit for breach of covenant was brought did not affect the right of the remaining partners to sue.

Where in a suit to enjoin the seller of a garage business from engaging in a competitive business, and for breach of a covenant not to engage in such business, no objection on account of failure to join the necessary parties complainant was made at the trial, it is too late on appeal to insist that some one else should have been included as complainant.

A suit in equity being for the determination and adjustment of the rights and liabilities of all concerned in the subject-matter, a court of equity may adapt its relief to the particular rights and liabilities of each party, and determine the interests of all so far as they are legitimately connected with the subject-matter and properly within the scope of the adjudication.

Where partners sued to enjoin the seller of a garage business from maintaining a competitive business and for damages for breach of such covenant, and one of the partners had withdrawn before suit and it appeared that the Chancellor had knowledge thereof, the reviewing court will assume that his decree was made with that knowledge in determining the interests and rights of all parties concerned.

If a party is guilty of laches or unreasonable delay in applying for an injunction, he thereby forfeits his claim to such remedy.

While there is no hard and fast rule as to what constitutes laches, barring injunction, generally, if there has been unreasonable delay in asserting claims, or if, knowing his rights, a party does not seasonably avail himself of means at hand for their enforcement, but suffers his adversary to incur expense, or enter into obligations, or otherwise change his position, or in any way by inaction lull suspicion of his demands to the harm of the other, or if there has been actual or passive acquiescence in the performance of the act complained of, equity will ordinarily refuse her aid.

Under ordinary circumstances, a suit for an injunction will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law; but, if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the Chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it.

In a suit to enjoin breach of covenant by the seller of a garage business not to engage in a competitive business, where it was not certain when complainants first had knowledge of the violation of the covenant, that seven months may have elapsed after having obtained such knowledge was not sufficient under the circumstances to establish laches.

In a suit to enjoin the breach of a covenant not to engage in a competitive business, complainants were not compelled to enter suit as soon as they obtained knowledge of the breach of the covenant, but they were entitled to reasonable time in which to consider whether it was advisable to sue.

In a suit to enjoin the breach of a covenant by the seller of a garage business not to engage in a competitive business, that complainants' mechanics had made certain small purchases from defendant while engaged in a competing business did not show acquiescence in the conduct of such business.

Construction of a contract by the parties is of no weight, unless the proper construction is in doubt.

Where defendant sold a garage business and covenanted with the purchaser not to engage in a competing business, "anywhere in or adjacent to" the town where the business sold was located, that he engaged in such a business on a main highway within half a mile of such town constituted a breach of the covenant.

Where a court of equity has once acquired jurisdiction of the case, it has power to grant compensatory damages, if requisite to promote the ends of justice; and hence, in a suit to restrain the operation of a competing business in violation of a covenant not to engage therein, a restraining order could be made, and compensatory damages could be awarded in addition thereto.

APPEAL FROM COURT OF CHANCERY. This is an appeal from a decree of the Court of Chancery, and the facts are so fully and clearly stated in the opinion of the Chancellor, *ante p.* 214, it is deemed unnecessary to repeat them at length here.

It is sufficient to say that George D. Wright and Son, the appellants, being engaged in the automobile business in the town of Smyrna, sold to George P. Scotton, on the nineteenth day of January, 1920, all their garage property, garage business, and goodwill, tools, mechanical equipment, and fixtures situated in their place of business in said town for the sum of $10,000.

The agreement of sale included the following provisions:

"It is agreed that the parties of the first part reserve the right to sell Buick cars, parts for Buick cars and to repair Buick cars in the town of Smyrna, and this reservation is a limitation of the sale of the good will above expressed.

"And the parties of the first part undertake, covenant, and agree to and with the party of the second part or his heirs, executors, administrators, and assigns that they or either of them will not hereafter operate a garage or service station or engage in the sale of automobiles or the supplies or repairs or accessories for same except by and according to the above and foregoing reservation anywhere in or adjacent to the town of Smyrna any time after the 2d day of February, A. D. 1920."

In accordance with said agreement the appellants' garage business, good will, tools, etc., were transferred on the second day of February, A. D. 1920, to George P. Scotton, who immediately engaged in the garage business, and associated with himself in said business James L. Scotton, George C. Scotton and Lyman J. Scotton.

James L. Scotton withdrew from the business about September 1, 1920, and thereafter the complainants below, trading as George P. Scotton and Sons, and trading also as Smyrna Nash Motors Company, conducted the said garage business purchased from George D. Wright and Son, the respondents below.

In the summer of 1920, George D. Wright and Son erected a garage along the state highway leading from Dover to Wilmington, and less than half a mile south of the corporate limits of the town of Smyrna. This highway passes directly the place of business purchased by Scotton from the Wrights. The garage of the appellants is two thousand and ten feet from the limits of the town of Smyrna, and is situated on the only street or road which runs into that town north and south. Practically all the traffic through Smyrna goes north and south on Main street and east and west on Commerce street, which two streets intersect in the center of the town about one-half mile from the town limits. The first incorporated town on said highway south of Smyrna is Dover, eleven miles distant, and the first one north is Odessa, which is about the same distance away. Clayton is about two miles west of Smyrna.

It appears from the evidence that the respondents below, appellants here, opened their new garage in August, 1920, and conducted it for several months as a Buick agency. But in March 1921, they took over the Ford agency, and have since conducted their place of business as a general garage or service station, where they engage in the general sale of automobiles, supplies, repairs, and asscessories, and sell, among other things, gasoline, oils, and Ford motor vehicles and parts.

On October 13, 1921, the appellees, complainants below, filed their bill in the Court of Chancery to enjoin further breaches of the above-mentioned agreement, and to recover damages sustained by the alleged wrongful and unlawful competition of the respondents.

The Chancellor on the eighteenth day of May, 1922, granted the injunction prayed for, and directed an issue of *quantun damnificatus* to be tried at the bar of the Superior Court in and for Kent County.

The appellants filed the following assingments of error:

. (1) That the Court of Chancery erred in holding that the appellees, the complainants in the bill, could maintain the suit, it appearing that the contract on which the suit was based was made with George P. Scotton, one of the complainants in the bill, and no assignment having been made by him to the other members of the partnership who were parties complainant.

(2) That said court erred in holding that James L. Scotton, one of the original partners with the other complainants in the bill, was not an indispensable party.

(3) That said court erred in holding that the contract on which the suit was based was partnership property, or that it inured to the benefit of the complainants, as partners, in any manner so as to enable the complainants, as partners, to maintain any suit thereon.

(4) That said court erred in holding that the defendants in the bill had violated the contract which is the subject of the suit.

(5) That said court erred in holding that the complainants in the bill were not guilty of such laches as defeated their right, if any they had, to an injunction.

(6) That said court erred in holding that the complainants in the bill were not guilty of such laches as defeated their right, if any they had, to recover damages.

(7) That said court erred in holding that the complainants were entitled both to an injunction and to damages.

(8) That said court erred in holding that there had not been such a construction by the parties themselves of the contract sued upon, as defeated the right of the complainants, or any of them, to maintain the action.

(9) That said court erred in directing that an issue of *quantum damnificatus* be submitted to jury.

PENNEWILL, C. J., and RICE, HARRINGTON, RICHARDS, and RODNEY, JJ., sitting.

*William H. Boyce, Daniel O Hastings*, and *Arley B. Magee*, for the appellants.

*William M. Hope*, and *James I. Boyce*, for the appellees.

PENNEWILL, C. J., delivering the opinion of the Court.

The first, second and third assignments of error go to the question of parties. It is contended by the appellants, that the covenant sued on, having been made with George P. Scotton, one of the complainants, individually, and no assignment of the covenant having been shown, the other complainants who became part-

ners with George P. Scotton in the garage business, are not entitled to any relief for the breach of said covenant, and cannot, therefore maintain this action.

Whether George C. Scotton and Lyman J. Scotton, two of the complainants, are proper parties to the suit, and entitled to relief therein, depends, of course, upon their relation to the restrictive covenant in question. Did that covenant, made by Wright and Son with George P. Scotton, inure only to the benefit of George P. Scotton and other persons to whom it might be formally assigned, or to George P. Scotton and other persons who might be associated with him in the business he purchased from Wright and Son, even though there was no formal assignment? It is admitted by the appellants, that after the sale of their garage business to George P. Scotton, he (the said George P. Scotton) immediately engaged in the garage business with James L. Scotton, George C. Scotton, and Lyman J. Scotton. There was formed between them an association or partnership, and the business which one of the partners had bought from Wright and Son became the business of all the partners.

When George P. Scotton purchased from Wright and Son their garage business, he purchased also the good will, and secured from Wright and Son an agreement that they would not engage in any competitive business. This agreement or covenant was necessarily and inseparably connected with the business that George P. Scotton bought from the Wrights, and passed to the firm or association that was immediately formed, of which George P. Scotton was a member, and which took over his garage business.

No formal assignment of the agreement was required, any more than a formal sale or transfer of the personal property which constituted a part of the garage business was required to vest it in all the partners. The covenant not to engage in any competitive business followed the business bought by the covenantee, and inured to his benefit as well as the benefit of any person associated with him as a partner in the same business. When the covenantee entered into a partnership with others, to carry on the business he had bought, he by that very act transferred to his partners everything that constituted a part of the business, which he could

transfer without writing. Such transfer included the restrictive covenant for the breach of which this suit was brought.

There is no doubt that the benefit of the covenant may be assigned with the business, and the assignee's rights will be protected. 4 *Pom. Eq. Juris.*, § 1715. This is not denied.

Such being the case, we think that any act of the covenantee which transfers the business and property, also transfers or assigns the covenant. *Knowles v. Jones*, 182 *Ala.* 187, 62 *South.* 514; *Haugen v. Sundseth*, 106 *Minn.* 129, 118 *N. W.* 666, 16 *Ann. Cas.* 259, and note.

The appellees admit their inability to find any case that supports their contention respecting the parties complainant, and we think none can be found. Perhaps there is no case that is exactly in point, but we are satisfied that sound reason, well settled principles of equity, and the following cases, which are somewhat analogous in principle to the present one, support our conclusion, that the complainants were the proper parties to sue for a breach of said covenant: *Palmer v. Toms*, 96 *Wis.* 367, 71 *N. W.* 654; *Knowles v. Jones*, 182 *Ala.* 187, 62 *South* 514; *Public Opinion Pub. Co. v. Ransom*, 34 *S. D.* 381, 148 *N. W.* 838, *Ann. Cas.* 1917A, 1010; *Satterthwait v. Marshall*, 4 *Del. Ch.* 337, 356, 357; *Mangan v. Schuykill County*, 273 *Pa.* 310, 116 *Atl.* 920.

The right of the complainants to sue was not affected by the fact that James L. Scotton, one of the partners, retired or withdrew from the firm before the suit was brought. It is admitted by the appellants that James L. Scotton withdrew from the business about September 1, 1920, and that thereafter the complainants, trading as George P. Scotton and Sons, and also trading as Smyrna Nash Motors Company, conducted the garage business purchased from Wright and Son. Having retired from the partnership and the business before the suit was brought, he was not a necessary party to the suit, and presumably had no interest at the time in the business, or in anything connected therewith, including the covenant in question.

The record shows that no objection or exception was taken in the court below on account of parties, and it is too late now, we think, to insist that some one else should have been included as complainant. And, besides, it is well settled that a suit in

equity is for the determination and adjustment of the rights and liabilities of all concerned in the subject-matter. It is the purpose of a court of equity to do complete justice by deciding upon and satisfying the rights of all the persons interested in the subject of the suit, so as to make the performance of the order of the court perfectly safe to those who are compelled to obey it and to prevent future litigation. 1 *Daniell, Chan. Pl. & Pr.* (6th *Anno. Ed.*) 190.

A court of equity may adapt its relief to the particular rights and liabilities of each party and determine the interests of all so far as they are legitimately connected with the subject-matter and properly within the scope of the adjudication. 1 *Pom. Eq. Juris.*, (*4th Ed.*) §§ 114, 115, 116.

The record shows that the Chancellor had knowledge of James L. Scotton's former relation to complainant's business, and this court will assume that his decree was made with that knowledge, in determining the interests and rights of all parties concerned in the determination of the suit.

Counsel for the appellants have stated in their brief, and announced to the court at the argument, that the fourth assignment of error would "not be considered." It is not necessary, therefore, for the court to consider in this connection one of the questions discussed at some length by the Chancellor, viz., whether the garage erected by the defendants outside the town limits of Smyrna was "adjacent" to said town, within the meaning of the restrictive agreement.

The fifth and sixth assignments of error raise the question of laches.

It is contended by the appellants that the complainants were guilty of such laches as defeated their right, if any they had, to an injunction or to recover damages.

It is true, as the appellants contend, that, equity will generally refuse its aid to stale demands. Laches, or inexcusable delay, have always been discountenanced. The rule is well established, independent of any statute of limitations, that if a party is guilty of laches or unreasonable delay in applying for an injunction, he thereby forfeits his claim to that special form of remedy. There is, however, no hard and fast rule as to what con-

stitutes laches, which has been defined as an "inexcusable delay" in asserting a right. Generally, if there has been unreasonable delay in asserting claims, or if, knowing his rights, a party does not seasonably avail himself of means at hand for their enforcement, but suffers his adversary to incur expense, or enter into obligations or otherwise change his position, or in any way by inaction lulls suspicion of his demands to the harm of the other, or if there has been actual or passive acquiescence in the performance of the act complained of, equity will ordinarily refuse her aid. 14 *R. C. L.* 360, 363.

A generally accepted and much relied on definition of "laches" is the following:

"The doctrine of laches in courts of equity is not an arbitrary or technical doctrine. Where it would be practically unjust to give a remedy, either because the party has, by his conduct, done that which might fairly be regarded as equivalent to a waiver of it, or where, by his conduct and neglect, he has, perhaps, not waiving that remedy, yet put the other party in a situation in which it would not be reasonable to place him, if the remedy were afterwards to be asserted in either of these cases, lapse of time is most material." 4 *Pom. Eq. Juris.*, 1442.

Under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitation at law; but, if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute, the Chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it. 4 *Pom. Eq. Juris.*, 1441.

These principles are well settled and familiar. If there had been inexcusable or unconscionable delay on the part of the complainants in bringing their suit after they had knowledge that the restrictive agreement was being violated by the respondents, a court of equity might afford no relief, but such a case is not shown by the testimony.

The present case differs from any of the cases cited by the appellants in this: That the building of the garage by the respondents was in no sense a notice to the complainants of a violation of

the contract on which the suit is based, and this fact is particularly important in determining the question of laches. The respondents had a right to continue in the Buick business; they had a right to build and maintain a garage for the conduct of that business; and the complainants may have thought the new garage was designed exclusively for such purpose. It was reasonable, under the circumstances, for them to so believe. There could be no laches on the part of the complainants until they knew that the contract was being violated. When did they obtain such knowledge? The testimony is vague on that point. It could not be obtained until they had good reason to believe that the respondents were doing an automobile business other than that pertaining to Buick cars.

It is not clear that the complainants could have had such knowledge before the respondents took over the Ford agency, which was seven months before complainants filed their bill. It is not certain from the testimony, therefore, when the complainants first had knowledge that the respondents had violated their agreement; but assuming they had such knowledge when the respondents first entered on the Ford business, the time that elapsed between that time and the bringing of their suit was not sufficient, under all the circumstances of the case, to establish laches.

This case differs very materially from those where the complainant stood by and silently acquiesced in the erection of a plant, and the building up of a business, of a competitive character, for the respondents had a right to build a garage and establish a business in connection with Buick cars. There was nothing to show that the business would be competitive until the Ford agency was taken over.

Moreover, the complainants were not compelled to enter suit as soon as they obtained knowledge that the respondents had breached their agreement. They were allowed reasonable time in which to consider whether it was advisable to take such step.

It is claimed by the appellants that knowledge, and consequent laches, on the part of the complainants is shown by the further fact, that during all the time subsequent to the building of respondents' garage, and up to the bringing of this suit, they showed their consent to, and acquiescence in, the acts and con-

duct now complained of, by dealing with the respondents in the purchase of automobile parts. But it does not appear from the testimony that such purchases consisted of something other than Buick parts. And, while the complainants admit that a few purchases might have been made from the respondents, they testified that such purchases were of very small value, and made by their mechanic without the direction or knowledge of the complainants. We do not think that such purchases had the effect contended for by the appellants, or recognized the business carried on by the respondents as permissible under the contract.

Inasmuch as the eighth assignment of error raises the question of "practical construction by the parties themselves of the contract sued on," which is closely related to the point last considered, we will briefly notice it before taking up the more important question raised by the seventh assingment.

The entire argument of the appellants in support of their eighth assignment is predicated upon a *doubt* as to the meaning of the words in the contract, "in or adjacent to the town of Smyrna." To sustain their contention they cite the following language from 13 *C. J.* 546, 547, 548:

"Where the parties to a contract have given it a practical construction by their conduct, as by acts in partial performance, such construction is entitled to great if not controlling weight in determining its proper interpretation, particularly where such interpretation is agreed on before any controversy has arisen. But practical construction is not conclusive, and may be considered only when the contract, read in the light of surrounding circumstances leaves the proper construction in doubt. The practical construction put on a contract by the parties cannot control the express unambiguous provisions of the instrument itself, and, further, a practical construction, to be adopted, must be reasonable."

We are unable to see that there has been any practical construction of the contract by the conduct or acts of the parties, as claimed by the appellants, but even if there had been it could have no weight unless the proper construction is in doubt. This clearly appears from the authority cited which states the correct rule.

The Chancellor held, and correctly we think, that there was no doubt about the meaning or proper construction of the words, "in or adjacent to the town of Smyrna," when read in the light of surrounding circumstances.

Being of the opinion that the contract is not ambiguous, or its proper construction doubtful, there is no reason to discuss the case cited by the appellants, and upon which they rely, viz., *Burton v. Douglass*, 141 *Wis.* 110, 123 *N. W.* 631, 18 *Ann. Cas.* 734, wherein the court said:

"The contract being ambiguous,  * * *  the construction placed thereon by the parties themselves becomes important."

But the facts were materially different from those in the present case.  As we have already said, the respondents had a right to erect and conduct a garage, adjacent to the town of Smyrna, confined to Buick business, and there is nothing in the testimony which shows that the complainants knew that the respondents were engaged in other automobile business until they took over the Ford agency seven months before complainants filed their bill.  In the *Burton-Douglas Case* the defendants engaged in business at two places very soon after the contract in question was executed, and it was not until about four years  thereafter that the complainants objected to a violation of the contract, and in their complaint made no objection to the business at said places.  The court held that under the construction placed on the contract by the conduct and silence of the parties, the places in which the defendants had engaged in business were not in "the vicinity" of Lake Geneva.

We have no doubt, in view of the conditions existing at the time the contract in question was made, that the garage erected by the respondents was "adjacent to the town of Smyrna," within the meaning of the agreement, and think this is not seriously controverted by the appellants.

. . Under the seventh assignment of error it is contended that the Chancellor cannot award damages to the complainants.

In their bill filed in this case the complainants ask:

"That the said respondents account for and pay to your orators their profits and your orators' damages for the breach of the undertakings, covenants and agreements of said respondents."

The Chancellor decreed that the injunction should issue as prayed for, and an issue, *quantum damnificatus*,  be directed to the Superior Court of Kent County to assess the damages down to

the date of the injunction; and the question submitted to the jury should be: How much have the complainants been damaged by the said breach of contract?

The question then is: Can such damages be awarded by the Chancellor to the complainants in this action?

In support of their contention the appellants cited the following authorities: 4 *Pomeroy's Eq. Juris., c.* 13; 1 *Pomeroy's Eq. Rem.*, §§ 270, 293; *High on Injunctions, vol.* 2 (*4th Ed.*) § 1182; *Pomeroy's Eq. Juris., vol.* 1 (*3d Ed.*) § 237; and three English cases, viz., *Scott. v. Macintosh,* 1 *Vesey & Beames,* 503, 25 *Eng. Rep.* 176; *Samtes v. Ferguson,* 41 *Eng. Rep.* 1275; *Fox v. Seard,* 55 *Eng. Rep.* 394; *Hogg v. Kirby,* 8 *Vesey's Rep.* 215.

We have not been able to find anything in these authorities that is really inconsistent with what now seems to be the generally accepted rule, viz: That where a court of equity has once acquired jurisdiction of the case it has power to grant compensatory damages, if requisite to promote the ends of justice. This is distinctly admitted by Mr. Pomeroy in his work last referred to. *Volume* 1, § 237.

See, also, 2 *Elliott on Contracts,* § 856; *Joyce on Injunctions,* § 473*f*; *Bispham, Prin. of Eq.,* (*9th Ed.*) 478; *Story, Eq. Juris.,* (*14th Ed.*) §§ 1084-1088; *Phillips v. Thompson,* 1 *Johns. Ch.* 131 (151); *McDowell v. Farmer's Bank,* 1 *Har.* 369; *Patterson v. Glassmire,* 166 *Pa.* 230, 31 *Atl.* 40; *Stofflet v. Sofflet,* 160 *Pa.* 529, 28 *Atl.* 857; *Swanson v. Kirby,* 98 *Ga.* 586, 26 *S. E.* 71; *My Laundry Co. v. Schmeling,* 129 *Wis.* 597, 109 *N. W.* 540; *Bailey v. Collins,* 59 *N. H.* 459; *Woodman v. Freeman,* 25 *Me.* 531.

In the case of *Woodman v. Freeman* the court said:

"There are many decided cases in which damages or compensation has been awarded, when the party did not appear to have any adequate remedy at law. There are many more cases, where damages have been awarded as incidental and auxiliary to other appropriate relief in equity, that such relief might be complete. This exercise of jurisdiction is legitimate and appropriate. For it would be an unsuitable and unworthy exercise of judicial power to require a party to multiply suits by resorting to two different tribunals to obtain a partial redress in each. This is not required by the rules and course of proceeding either in equity or at law."

In the Delaware case above mentioned, *McDowell v. Framers' Bank,* the court said:

"We decline ordering an issue as asked, although we don't doubt the power of the court to do so in a case like the present if we thought it necessary, as we have enough before us to attain what is equitable between the parties."

The English cases cited by the appellants were either those in which there was a penalty provided as liquidated damages, a bond given to secure performance of the agreement, or in which the complainants had recovered damages at law.

Obviously such cases are not in point here.

The only basis we have been able to find for the claim that a court of equity will not award damages or compensation, when it has acquired jurisdiction, is the following statement by Lord Eldon in the case of *Scott v. Macintosh, supra*:

"I do not recollect an instance of a bill for an account upon a covenant not to carry on a particular trade. The usual course is a bill of discovery for the purpose of an action."

But in the later case of *Hogg v. Kirby*, 8 *Vesey*, 222, Lord Eldon held that:

"It being nearly impossible to ascertain the extent of the damages the remedy was by injunction, and account of profits."

In *Patterson v. Glassmire, supra*, in commenting on what was called the "dictum" of Lord Eldon in the *Scott-Macintosh Case*, the master said:

"But in view of the changes in the course of procedure in equity since Lord Eldon's day, and the present disposition, as enunciated in all the decisions to determine by the same proceeding all the rights in the cause, the master apprehends that a bill for an account would now substitute the method laid down by Lord Eldon as the usual course. 'When a court of equity has once acquired jurisdiction, it will retain it, in order to satisfy all the just requirements of the case between the parties in respect to the subject-matter.' *Wat. Spec. Perf.*, § 514."

The appellants admit that under the Pennsylvania decisions the plaintiff is entitled to damages in addition to the injunction.

In the above-mentioned case of *Patterson v. Glassmire*, it was said by the master and affirmed by the court:

"Courts of equity, under the old rule, refrained altogether from awarding pecuniary reparation for damage sustained. *Sedg. Dam.* § 3. This rule has been, however, modified from time to time, and is now abrogated by statute,

in England, in all cases where Chancery had jurisdiction to entertain applications for injunction against the breach of any contract. *St.* 21 & 22 *Vict. c.* 27. In this country it is now generally accepted that a court of equity has power to decree compensation, as incidental to other relief (*Bish. Eq.* § 478; *Story Eq. Jr.* § 794); not, indeed, as damages, in the sense in which the law gives them, but as a substitute for damages (*Root v. Railway Co.*, 105 *U. S.* 215). By some the power is based upon the necessity of preventing a multiplicity of suits; * * * by others, from the necessity of doing complete justice as between the parties. * * * The course of proceeding is by reference to a master, or by a *quantum damnificatus.* * * Inasmuch as agreements in restraint of trade usually provide a penalty as liquidated damages in case of breach, * * * the books are wanting in authorities on the subject of compensation in equity cases, where such provisions do not exist. The master, however, is unable to perceive any distinction between the principle underlying this class of cases and those of the infringement of patents and copywrights, wherein courts of equity apply as far as possible the ordinary rules for the measurement of damages to property rights. *Sedg. Dam.* § 1213. And certainly the good will which is to be protected in this instance would seem to be as much property as is the right to a patent or copyright."

The subject under consideration was treated at considerable length in *State v. Sunapee Dam Co.*, 72 *N. H.* 114, 55 *Atl.* 899.

In that case the court was composed of four judges and they divided equally upon one or more of the questions raised, but did not disagree upon the question with which we are concerned. And while the court realized there could be no authoritative decision because of the equal division, they thought that on account of the importance of the questions and interest involved opinions should be filed. The opinions are long, and it would unduly prolong this one to quote at length from them, or make an intelligent statement of the facts.

In the first opinion it was said:

"The difficulty encountered is over the order for a master to assess damages. Upon this question the court are equally divided."

It was further said:

"It has been contended (1) that equity is without jurisdiction to assess the damages, that it must be done at law; (2) that, if it can be done in equity, it is the constitutional right of the defendants to have it done by a jury; and (3) that, in any event, the motion for a master should have been denied, and the assessment sent to the jury as a matter of discretion or practice, and that in this view, as well as upon the ground of constitutional right, the action of the Superior Court in granting the plaintiff's motion should be reversed.

That damages may be assessed in equity (the court otherwise having juris-·
diction) in order 'to do complete justice' and accomplish 'final determination'
is firmly established. [*Cases cited.*] The vital question then, is: Did equity
have jurisdiction of the present case at the time the assessment in question
was ordered?"

It will be observed that the two questions on which the court
divided were (1) whether equity had jurisdiction of the case;
and (2) whether the defendants were entitled to a jury trial,
either as a constitutional right, or as a matter of discretion or
practice.

That there was no disagreement or dissent on the proposition,
that damages may be assessed in equity (the court having other-
wise jurisdiction), in order to do complete justice and accomplish
final determination, is clear from certain parts of the second
opinion delivered by the Chief Justice, viz.:

"As a general rule, a court of equity, does not have jurisdiction to assess
damages for the breach of a contract or for a tort, in the absence of some
equitable ground for such relief. [*Cases.*] If the court has jurisdiction of the
subject-matter, and decrees equitable relief, it may consider and adjust the
plaintiff's damages for past injuries as an incident to the relief afforded. [*Cases.*]
'It results from these principles that any defense which goes to the whole
ground of the relief by injunction is fatal to the bill, and, such defense being
sustained, the court will not retain the bill for any purpose of setting the
damages.' "

The Chief Justice was of the opinion that the plaintiffs were
not entitled to an injunction, and that equity, therefore, was with-
out jurisdiction.

It cannot be questioned that the Chancellor had jurisdiction
of the case before us for the purpose of granting an injunction, if
he believed the complainants had no adequate remedy at law.
The question is: Had he the right to grant, not only an injunction
against future breaches, but also to award damages for past
breaches.

The court are of the opinion, under practically all recent
authorities, in this country at least, that the Chancellor had the
right to grant both remedies, because both were required to give
full relief to the complainants, satisfy all the just requirements of
the case, and promote the ends of justice, and are also of the opin-
ion, that, the Chancellor, having the power to award damages

sustained by the complainants between the breach of the contract and the granting of the injunction, had the right to direct that an issue of *quantum damnificatus* be submitted to a jury to ascertain the same.

If the Chancellor had granted injunction only, the complainants would have been compelled to sue in another court for damages, when full relief could be had in the one Chancery proceeding. The prevention of multiplicity of suits is one of the reasons for the awarding of damages by a court of equity when it has jurisdiction of the subject-matter.

It may be true, as stated in 4 *Pomeroy's Eq. Juris.*, 1721, that:

"If the breach of the contract committed, or threatened, can be adequately redressed by the recovery of damages in a single suit at law, injunction will not issue to restrain the breach."

But it is manifest that damages for past breaches, and for breaches that might occur in the future, in the present case, could not be redressed in a single suit at law. The only adequate redress would be damages for past breaches and injunction against future ones. The Chancellor, having jurisdiction to grant an injunction, had also the power to award damages in one and the same suit in equity.

It must be conceded, that the English cases, and some of the earlier American cases (particularly in New York), respecting the power of a court of equity to award damages, as such, for the breach of a contract, are conflicting, and it would be useless and unprofitable to review or attempt to reconcile them. But we think that practically all of them recognize the power of equity to grant compensation for past breaches in addition to injunctive relief. We are unable to understand just what is meant by "compensation" in some cases, unless it be damages or something in the nature thereof.

Whatever the award may be called, whether compensation, or damages, we take it to be something that will furnish full and adequate relief.

The English act, above referred to, known as "Lord Cairns Act," passed in 1858, conferred upon the Court of Chancery the express power to award damages in all cases in which the court had jurisdiction to entertain an application for an injunction

against the breach of any covenant, contract or agreement, as against the commission or continuance of any wrongful act; or, for the specific performance of any covenant, contract or agreement, it should be lawful for the same court, if it should think fit, to award damages to the party injured either in addition to or in substitution for such injunction or specific performance; and that such damages might be assessed in such manner as the court should direct.

It will be noted that the jurisdiction to award damages, conferred by said act was discretionary, and that the act in no way restricted the power which Courts of Chancery had previously had to issue injunction.

The real purpose of the act must have been to make it clear that Courts of Chancery would thereafter have the power which some courts had theretofore exercised and others declined, viz.: to award damages or compensation in addition to injunctive relief in cases where it was considered that injunctive relief alone would not be adequate.

Before the passage of that act, it was held in numerous cases that such power existed in Courts of Chancery, and would be exercised if the peculiar or particular circumstances of the case required it to do full justice. The following cases may be mentioned: *Jesus College v. Bloom*, (1745) 3 *Atk.* 262, 26 *Eng. Reprint*, 953; *Louden v. Nash*, (1747) 3 *Atk.* 512, 26 *Eng. Reprint*, 1095; ————*v. White*, (1818) 4 *Swanst.* 107, *Eng. Reprint.* 792; *Ferguson v. Tadman*, (1877) 1 *Sim.* 530, 57 *Eng.* 676; *Nelson v. Bridges*, (1838) 2 *Beav.* 239; *Prothers v. Phelps*, (1855) 7 *DeG. M. & G.* 734.

The decree of the Chancellor will be affirmed.