136 A.2d 196 (1957)
Charles H. REEVE, Jr., trading as Reeve Tastee-Freez, Plaintiff,
v.
Edmund R. HAWKE, Blanche Hawke, and Nathan Porter, trading as Harvey's Diner, Defendants.
Court of Chancery of Delaware, New Castle.
November 8, 1957.
*197 H. James Conaway, Jr., Wilmington, for plaintiff.
Charles L. Paruszewski, Wilmington, for defendants Edmund R. Hawke and Blanche Hawke.
Joseph H. Flanzer, Wilmington, for defendant Nathan Porter.
MARVEL, Vice Chancellor.
On July 23, 1953, the defendants, Edmund R. Hawke and[1] Blanche Hawke, his wife, leased to the[2] plaintiff a tract of land situate on the southeasterly side of Maryland Avenue in Christiana Hundred. This tract has a frontage of 100 feet on Maryland Avenue and a similar frontage on Champlain Avenue, an intersecting unopened street. The term of the lease was fixed at five years with the right in the lessee to extend his occupancy for an additional five years as well as the right to cancel the lease at the expiration of two years from its original date. It also contained the following covenant:
"It is mutually covenanted and agreed by and between the Lessors and the Lessee that the said Lessee will use *198 and occupy said premises for the purpose of selling thereon soft ice-cream, food, soft drinks, confectioneries and allied or kindred products only and shall not use said premises for any other business or purpose without first having obtained in writing the consent of the Lessors therefor."
Consent to use the premises for any other business or purpose has not been granted by the lessors. A supplement to the original lease, dated July 29, 1953, provides as follows:
"Said Lessors shall not during the term granted in the aforesaid Indenture of Lease, rent, lease, demise or let any ground within Five Hundred feet (500') of the premises demised by the aforesaid Indenture of Lease to said lessee to any other person, persons, firms, association or corporation for the purposes of conducting a business similar to that authorized by the aforesaid Indenture of Lease."
Thereafter on August 17, 1954 Mr. and Mrs. Hawke leased other lands owned by them on Maryland Avenue to the defendant, Porter, which lands are situate directly across Champlain Avenue from plaintiff's building and immediately to the rear of such building.
Paragraph 4 of the Porter lease provides as follows:
"It is mutually covenanted and agreed by and between Lessors and Lessee that the said Lessee shall conduct on said premises a[3]drive-in diner business only. However, by so doing, said Lessee shall not be prevented from selling ice cream or allied products in the regular course of his diner business."
Plaintiff charges that the defendant, Porter, having entered into the lease referred to above with knowledge of the Reeve lease, has unfairly competed with plaintiff insofar as he has sold ice cream, soft drinks and confectioneries and the like in his diner business and will further injure plaintiff, if, as contemplated, a so-called curb service is put into operation. Plaintiff seeks relief against Porter in the form of an order enjoining him from operating a curb service and from selling "* * * any ice cream, ice cream products, soft drinks, confectioneries, and allied or kindred products * * *" and against Mr. and Mrs. Hawke in the form of an order enjoining them from violating their covenant with plaintiff "* * * by encouraging and acquiescing in the breach thereof by * * *" the defendant, Porter, and directing them, to take appropriate legal proceedings against Porter. Plaintiff also seeks damages as a corollary to injunctive relief, claiming losses of $6,500 and other damages in 1955 as a result of unfair competition, and alternatively, should injunctive relief not be granted, the reduction of rental payments from $125 to $50 a month plus damages.
It appears from the testimony that Reeve having become interested in the early part of 1953 in the idea of operating a soft ice cream stand got in touch with the Tastee-Freez franchise holder for the Delaware area who in turn entered into negotiations with Hawke looking toward the obtaining of a site on Maryland Avenue. The lease of such site, as finally drafted and supplemented, authorized Reeve to erect on the rented premises "* * * such a building as may be necessary to properly conduct such business as is authorized by this lease * * *" but expressly stipulated that: "Said building shall not cost more than seven thousand dollars ($7,000.00) to construct." It was further agreed that on termination of the lease the building to be constructed by Reeve would become the absolute property of the lessors.
*199 To begin with I am satisfied that one of the matters foremost in plaintiff's mind in his negotiations with Mr. Hawke was a desire to obtain contractual assurances to the extent possible that plaintiff's proposed business would not be subjected to business competition on other lands of the lessors. Accordingly, I find that the so-called supplement to the Reeve lease which contains Hawke's agreement not to rent to any person within 500 feet of the Reeve lot during the term of the Reeve lease "* * * for the purpose of conducting a business similar to that authorized by the * * *" Reeve lease is an integral part of the contract between plaintiff and his lessors, and that the difference in dates of execution of the original and supplemental lease is explained by the fact that the original was mailed to Florida for execution by Mrs. Hawke and was not returned to Wilmington until on or about July 29, 1953. Furthermore, the supplement not only recites a token consideration but in addition states as consideration for its execution the covenants, promises and agreements set forth in the original lease. Finally, the supplement is under seal, is backed with the original lease, and shows on its face that it was entered into prior to August 15, 1953, the effective date of the original lease.
Where the litigants actually part company is as to what business activities are "similar" to plaintiff's and so subject to the covenant of the Reeve-Hawke lease. It is vigorously contended by plaintiff that despite the modest size of his conventional roadside soft ice cream booth (which cost $5,400 to erect and because of the contract limitation may not be enlarged to any substantial extent) he is entitled to be free of competition from businesses broadly similar to his on other lands of the lessors within 500 feet of plaintiff's stand. Plaintiff claims that from the beginning of his Tastee Freez operation he has sold sherbets, crackers, root beer and other soft drinks as well as soft and hard ice cream, that he is contractually authorized to sell food generally, and that Porter's diner operation has seriously damaged and will continue to damage plaintiff's business. Plaintiff does not object to the sale by Porter of hard ice cream with meals, or complain of such meals as such, but contends that inasmuch as plaintiff's customers necessarily consume their purchases outside of his Tastee Freez stand, Porter may not similarly serve his patrons outside of his diner.
The defendant, Porter, concedes that Hawke had expressed concern about Reeve's contractual rights in the soft ice cream field at the time the Porter-Hawke lease was negotiated, a concern which was given formal recognition in a December 12, 1955, supplement to such lease. Under the terms of this supplement Porter agreed that he would not: "* * * sell or offer for sale any soft ice cream, also known as frozen custard, in the operation of his diner business * * *", and I find that Porter has in fact abstained from selling soft ice cream. Porter, however, considers "curb" service and "drive-in" service to be one and the same thing and contends that he is not contractually bound to refrain from serving customers outside of his diner whether or not a telephonic system for summoning such service is put into operation.
The defendant, Hawke, believes that Reeve should be protected from competition by Porter but that such protection should extend only to requiring Porter to refrain from selling any ice cream except with meals served by the diner. Unlike Porter, however, Hawke does not equate "curb" service with "drive-in" service and feels strongly that if Porter's proposed telephonic ordering service were to be put into operation, Reeve's "curb" service would be seriously and unfairly damaged.
A convenant reasonably restraining competition in a limited area for a limited time is not void as being in restraint of trade particularly when made in connection with the purchase or leasing of land, Aiello Bros. Inc., v. Saybrook *200 Holding Corp., 106 N.J.Eq. 3, 149 A. 587, and Annotation in 90 A.L.R. 1449. It is also apparent, as indicated in the cited case, that modern American courts look to the substance of the parties' conduct under a covenant rather than to the precise language of the clause sued upon. Compare contra, Briggs v. Thornton [1904] 1 Ch. 386. Furthermore, while the parol evidence rule generally bars the introduction of testimony which tends to vary an agreement which has been reduced to writing, the actions taken by parties under an agreement are often[4] illuminating.
Turning again to the case at bar, what were the parties' undertakings and what are their rights? First of all I am satisfied that plaintiff who at the time of execution of the Porter lease had operated as a[5] dispenser of Tastee Freez during one season not only knew about the negotiations leading up to the Porter-Hawke lease of August 17, 1954, but actually anticipated that the contemplated diner would stimulate his Tastee Freez business. It is also indicative of Reeve's self identification with the soft ice cream business that he had expressed no concern about an adjacent road stand and a gasoline service station, both of which were selling foodstuffs and soft drinks at the time he made his contract with Mr. Hawke. Furthermore, although plaintiff sometime after Porter's diner opened complained to Hawke about Porter's selling of ice cream, it was not until the summer of 1955 when Porter began the installation of a telephonic service for the placing of orders from parked cars that plaintiff became actively disturbed about his contractual rights.
In fact it is the curb service aspect of Porter's diner about which plaintiff principally complains. Significantly, plaintiff does not seek any relief from injuries allegedly caused him by reason of Porter's sale of food, and in view of his waiver of any rights he may have had to protection from general competition in such field, he could not successfully seek such relief, Keil Motor Co. v. Royal Insurance Co., 6 W.W.Harr. 24, 171 A. 201, Romer v. Porcelain Products, Inc., 23 Del.Ch. 52, 2 A.2d 75. An additional reason for refusing plaintiff general relief from the competition furnished by Porter's diner activities, had such relief been sought, would be that plaintiff stood idly by while Porter spent some $140,000 in erecting his diner. Under such circumstances equity will refuse her aid despite express contractual rights. Compare Wright v. Scotton, 13 Del.Ch. 402, 121 A. 69, 31 A. L.R. 1162.
Turning to Porter's past and prospective plans to sell to customers in their cars, I fail to find any violation of plaintiff's contractual rights as claimed. The Reeve-Hawke lease on its face does not purport to protect plaintiff's method of selling to the public and the evidence fails to support plaintiff's contention that he negotiated for protection from competition in such field. Finally, as noted above, Porter spent substantial sums not only for the diner but also for a paved parking lot during which time plaintiff made no complaint other than to protest the temporary inconvenience caused him by the surfacing of Champlain Avenue. Plaintiff is in no position successfully to protest Porter's use of such parking lot, Wright v. Scotton, supra.
While it is apparent from the testimony that Hawke in 1955 became concerned *201 about the possibility of injury to Reeve as a result of sales outside of the Porter diner, I fail to find any right in plaintiff entitling him to any relief injunctive or otherwise from injury caused or threatened by Porter's sales of foodstuffs other than the specific items listed in the Reeve-Hawke lease about which Reeve complains, namely soft ice cream, soft drinks, confectioneries and allied or kindred products.
In view of the above findings what relief should be granted plaintiff and against whom? The theory behind the granting of relief against a subsequent lessee who is not a party to the covenant sued upon is that when such a defendant has knowledge of the terms of the first lease he may not be permitted to benefit from his later lease covering the same or similar business, Aiello Bros., Inc., v. Saybrook Holding Corporation, supra; Western Union Telegraph Co. v. Rogers, 42 N.J.Eq. 311, 11 A. 13. Such notice may in certain cases be constructive rather than actual, particularly when the second lease is explicit as to the prohibited uses, Holloway Bros. v. Hill [1902] 2 Ch. 612. In the case at bar the defendant, Porter, admittedly knew that plaintiff had contractual rights entitling him to be the exclusive dispenser of soft ice cream on Hawke lands within 500 feet of plaintiff's stand, and Porter agreed to respect these rights by undertaking not to sell soft ice cream in his diner business, an agreement which he has not breached. I am satisfied that Porter's understanding of plaintiff's contractual rights was that Reeve was protected solely in the business of selling Tastee Freez, and the evidence as to plaintiff's activities in the summer of 1954 supports the reasonableness of Porter's assumption.
It is indicative of Porter's thinking and understanding that Porter in his initial agreement with Hawke had reserved the right to sell "ice cream or allied products in the regular course of his diner business." Such reservation points up the reasonableness of Porter's assumption that plaintiff was entitled to be protected solely in what was his ostensible business namely that of dispensing Tastee Freez as such. Finally, there is no doubt in my mind that soft ice cream as a foodstuff differs substantially from conventional or hard ice cream. Admittedly the two products contain essentially the same ingredients, but they are processed to different consistencies at different temperatures by different machinery, and they are dispensed in different fashion. People in the ice cream industry as well as the general public look on the two products as separate and distinct foodstuffs, a fact which Reeve concedes.
In view of my finding that Porter had knowledge solely of plaintiff's rights in the field of selling soft ice cream and my earlier finding that plaintiff is not entitled to be generally protected from competitive sales outside of Porter's diner, it follows that plaintiff's right to be protected directly from competition by Porter must necessarily be confined to the field of soft ice cream sales. There is no evidence, however, that Porter sells soft ice cream and consequently no basis for any relief, injunctive or otherwise, against Porter has been established.
As I have indicated, relief outside of the narrow field above indicated may not be granted because the evidence, unlike that in Aiello Bros., Inc., v. Saybrook Holding Corporation, supra [106 N.J.Eq. 3, 149 A. 588], fails to support a finding that Porter participated in a "* * * fraudulent letting with full notice of the complainant's covenant, which it [he] was in conscience bound to respect, not to violate." Because, however, it is claimed that the defendant Porter sells soft drinks, confectioneries and the like, and there is evidence that he does, plaintiff is entitled to relief, *202 but, as indicated above, such relief must be obtained from the lessors.
The next question is that of what form plaintiff's relief against the defendant, Hawke, should take. Upon violation of a lessor's covenant not to allow a competing business on other lands owned by him, the original lessee may rescind, or he may stay in possession and at the end of the lease sue for loss of profits; or he may treat the violation of the covenant as putting an end to the contract for purposes of its performance and sue for damages, Hiatt Investment Co. v. Buehler, 225 Mo.App. 151, 16 S.W.2d 219.
It is also well established that a court of equity has the authority to protect by injunction the rights of a tenant under a covenant and that such remedy is available both against a lessor and a subsequent lessee with notice of the covenant sued upon where damages are irreparable and difficult of Computation, Rosen v. Wolff, 152 Ga. 578, 110 S.E. 877, however, in my opinion, under the facts and circumstances above related injunctive relief as prayed for should not be granted for breach of the covenant of the present Reeve-Hawke lease. Damages may be appropriately determined. See Annotation, 90 A. L.R. 1449 at page 1470.
The question as to exactly how such damages should be determined remains. While it was stipulated at trial that the matter of determining damages would be deferred until plaintiff's rights, if any, had been established, the Court has not had the benefit of counsel's views as to the proper forum for determining such damages or their position on plaintiff's right, if any, to injunctive relief against new or renewed leases by the defendant, Hawke, of lands in the area here involved. On notice a briefing schedule on these questions will be arranged. Thereafter an appropriate order will be entered.
NOTES
[1] Mrs. Hawke's interest in the lands here involved is limited to her inchoate right of dower.
[2] The complaint joined Jean Wolfe Reeve as a party plaintiff, however, her interest in Reeve Tastee Freez having since terminated, it was stipulated at trial that her claim be withdrawn, and it was so ordered.
[3] In the original lease this word is interlined, between the words "a" and "diner", however, I am satisfied that the interlineation was made before the lease was executed.
[4] As stated by the Lord Chancellor in the early case of Attorney General v. Drummond, 1 Drury & Warren, 353 at 368: "Tell me what you have done under such a deed and I will tell you what that deed means." Compare Gluckman v. Holzman, 29 Del.Ch. 458, 51 A. 2d 487.
[5] At no time has plaintiff sold more than an inconsequential amount of hard or conventional ice cream. He estimated such sales to be as low as 2% of his ice cream business. The evidence also discloses that in the summer of 1955 plaintiff sold some soft drinks, crackers and the like.