PAUL J. TUREK and DORIS B. TUREK, his wife,
Plaintiffs,

*vs.*

MARGARET V. TULL,
Defendant.

*New Castle, February 28, 1958.*

*Edmund D. Lyons,* Wilmington, for plaintiffs.

*H. Albert Young* and *Bruce M. Stargatt,* Wilmington, for defendant.

MARVEL, Vice Chancellor: On October 7, 1948, Mr. and Mrs. Paul Turek entered into an agreement[1] with the defendant, Margaret V. Tull, under the terms of which plaintiffs agreed to buy defendant's home at 1506 Broom Street in Wilmington, Delaware, together with the business there operated by Mrs. Tull under the name of Tull Sanitarium. For three years preceding the sale, defendant had operated a nursing or rest home at the Broom Street address, having equipped it so as to provide bed and lodging for nineteen residents, and she had established for herself a firm position in the business of caring for the convalescent and senile. Paragraph six of the agreement of sale provided as follows:

> "#6 The seller agrees that she will not directly or indirectly, alone or with others, in her name or in any other name, engage in the business of operating and conducting a sanitarium or hos-

---

1. On March 26, 1951, the agreement was amended but only as to the price to be paid by plaintiffs for their purchase.

pital in New Castle County and State of Delaware, for a period of ten years from the date hereof."

Since 1948 plaintiffs have continued to operate a nursing or rest home business at the Broom Street address, having changed the name of the establishment to Rest Haven shortly after they took over as managers. Having to a considerable extent modernized facilities at the premises, plaintiffs since 1948 have furnished nursing care and treatment to ill and convalescent persons including the aged, under the directions of visiting doctors.

In the early part of 1956, plaintiffs learned that defendant was carrying on a business at an establishment known as The Delawarean located at 5109 Governor Printz Boulevard and became convinced that this operation involved not only the furnishing of bed and board but also the giving of nursing care to elderly invalids. Through their attorney, plaintiffs demanded that defendant discontinue this operation on the grounds that she was in effect operating essentially the same type of business she had sold to the plaintiffs and consequently violating paragraph six of the agreement of sale. Defendant, having taken the position that she was merely running a boarding house, refused to comply with plaintiffs' demand, and this suit for injunctive relief and for an accounting was then filed. This is the decision of the Court after final hearing.

Plaintiffs do not contend that defendant has engaged in the business of operating a hospital. They do contend, however, that inasmuch as the word sanitarium[2] had been expressly chosen by defendant in naming her former business, such word being employed in its broadest sense, the same meaning should be given to it in construing the parties' agreement. Plaintiffs argue that the covenant in question should therefor be construed so as to bar defendant from now engaging in a business which they contend is substantially the same as the one she sold to plaintiffs.

---

2. It does not appear from the evidence that the Tull Sanitarium as operated by defendant prior to the sale could have qualified as a "sanitarium" under the Delaware State Board of Health regulations governing licensing.

Defendant, in reply, contends that the language of paragraph six merely forbids her to * * * "engage in the business of operating and conducting a sanitarium or hospital * * *" and since the type of business which she presently operates does not fall within the accepted definitions of these words, she is not guilty of a breach of her agreement. In support of this contention defendant relies on numerous authorities, particularly judicial definitions of the words hospital and sanitarium in cases having to do with the enforcement of zoning regulations, and takes a firm position that there can be no ambiguity in the meaning of these words. She concludes with some logic that inasmuch as she is obviously operating neither a hospital nor a sanitarium in the strict sense the suit should be dismissed.

While the parole evidence rule generally bars the use of oral testimony to vary the terms of a formal written undertaking, contractual terms apparently clear on their face may some times be shown to possess a particular meaning in the minds of the contracting parties in the light of facts and circumstances surrounding the making of the agreement. 3 *Williston on Contracts* (Rev.Ed.) § 609. The term sanitarium as used in paragraph six of the sales agreement must be read in the light of the actual bargain between the parties, *Restatement of The Law, Contracts* § 230. See also *Radio Corporation of America v. Philadelphia Storage Battery Co.*, 23 *Del.Ch.* 289, 6 *A.2d* 329. Here in order to get at the parties' intent it is hardly necessary to go beyond the four corners of the agreement which on its face discloses that what was bargained for in part was an agreement by the seller to refrain from competing with the buyer for a period of ten years.

Going outside of the agreement, the evidence clearly supports a finding that the obvious purpose of the covenant was to assure protection of the good will[3] of Tull Sanitarium which was being

---

3. The value to be placed upon this asset is in dispute, however, it was obviously a substantial item in the minds of the contracting parties. Plaintiffs estimate that the tangible assets of the business including real estate had a value of about $25,000 at the time of the sale, while defendant contends such value to have been between $25,000 and $35,000. The total sale price, including good will, was originally $70,000, however the amendment of March 26, 1951 reduced and altered plaintiffs' financial obligation to defendant.

purchased by plaintiffs from the defendant. Any other interpretation would lead to an absurd result. Defendant at the time of the agreement had never operated a hospital or sanitarium, but was and had been operating a rest home or nursing home for convalescents and the aged infirm. Finally, plaintiffs having continued to operate the purchased premises as a nursing home, are entitled to look to defendant's covenant for relief. Though modernized and improved, the nature of the business sold to plaintiffs has not materially changed since the date of sale, and today Rest Haven qualifies as a nursing home for Delaware State Board of Health licensing purposes.

Defendant concedes that the Tull Sanitarium would not have qualified as other than a nursing home at any time during her ownership and control of its operation, and it was for protection against competition by defendant in such business that plaintiffs were willing to pay a substantial amount. In my opinion the only reasonable interpretation to be given to the word sanitarium, as it appears in paragraph six of the sales agreement, should be one designed to bar defendant from engaging in any business activity in competition with the one sold to plaintiffs.

The evidence clearly supports a finding that defendant presently provides lodging for elderly persons and despite her protestation that she accepts only healthy guests, it is apparent that her taking in of persons who are mentally and physically senile has been something more than fortuitous. While the atmosphere of Rest Haven is somewhat akin to that of a true sanitarium in contrast to the more homelike aspects of The Delawarean, both are frequented by non-resident doctors on call and the nursing equipment at both institutions is essentially similar, notwithstanding the more institutionalized arrangements at Rest Haven. Significantly, Mrs. Tull is a licensed practical nurse with broad experience in caring for convalescent and chronic invalids.

Mrs. Sanders, a witness for defendant, testified that her mother-in-law was sent to The Delawarean because she was becoming senile, and that she was later readmitted upon her return from the hospital

following treatment of a fracture even though she then required full nursing care. Dr. Harvey Fell testified that his aged mother was accepted at The Delawarean at a time when she was arthritic and senile. A Mrs. Allen was admittedly bedridden at defendant's establishment for at least a year prior to her death. Dr. Parvis testified that he considered it necessary to see some six residents of The Delawarean every week or ten days. One of these persons at the time was suffering from arteriosclerosis and hypertension, while others, at various stages of senility, from time to time required some medical attention for some complaint or another. This same witness testified that his own father required at least custodial care on being moved to The Delawarean.

Furthermore, plaintiffs' exhibit No. 6, a copy of defendant's 1955 federal income tax return, contains the taxpayer's admission that her business was then a nursing home. While this description was changed to boarding home on her 1956 tax return, her quarterly payroll reports to the Delaware Unemployment Compensation Commission covering the period from April 1956 to April 1957, disclose that the nature of her business had not actually changed during this latter period.

Defendant concedes that the type of resident she now accepts at The Delawarean would have been accepted by her at Tull Sanitarium and that at the time of the sale here involved at last three persons of the type now resident at The Delawarean were being cared for at the Tull Sanitarium. In short, I find no merit in defendant's contention that competition has not been shown merely because there is no direct evidence that persons now accepted by defendant would have gone to Rest Haven, had defendant not been in business. Defendant is maintaining an establishment which accepts persons who might otherwise go to Rest Haven and this is competition.

The cessation of defendant's activities in the same line of business which plaintiffs had purchased from her was the object sought to be achieved in paragraph six of the agreement of sale, and defendant has clearly broken such covenant. In the case of *Scotton v. Wright,* 13 *Del.Ch.* 214, 117 *A.* 131, 133, affirmed 13 *Del.Ch.* 402, 121 *A.* 69, 31

*A.L.R.* 1162, where the purchaser of a business agreed not to compete "* * * in or adjacent to the Town of Smyrna * * *", the Chancellor in interpreting the meaning of the word adjacent stated "* * * the word as used in the agreement of sale, is to receive that one of its meanings which in fairness can be said to best meet the object sought to be accomplished by the parties who used it * * *" It follows that plaintiffs are entitled to relief from such competition unless there are other factors involved which would make it inequitable to grant such relief, *Scotton v. Wright, supra.*

The covenant sought to be enforced is attacked on the grounds that it imposes an unreasonable restraint on trade and is therefore unlawful. It is established, however, that in the sale of a business and its good will, a promise by the seller not to compete will be enforced if reasonably limited as to time, area and purpose and if such promise does not constitute an unreasonable restraint of trade or otherwise contravene public policy. Or, as has been stated, if at the time of the sale of a business a covenant not to compete is no broader than is necessary for the adequate protection of the buyer and does not tend to create a monopoly, it is generally valid, 5 *Williston on Contracts* (Rev.Ed.) § 1641. The restraint here sued upon was designed to prevent defendant from reentering the nursing home business for a period of ten years in New Castle County and considering the price paid and other elements of the transaction is reasonably limited as to time and area. See Annotation in 45 *A.L.R.2d* 77, particularly at p. 238 et seq. Furthermore inasmuch as I have found that the seller's promise was designed to protect the buyer from competition by the seller in the same line of business, whether directly or indirectly, the narrow rule of *General Baking Co. v. Soles,* 18 *Del.Ch.* 343, 162 *A.* 58, has no application.

Turning to the defense of laches, there is first of all no showing that plaintiffs had more than a suspicion of any breach of covenant on defendant's part prior to 1956. Plaintiffs in 1952 did see doctors leaving the establishment then operated by the defendant on Gilpin Avenue in this city, leading to the thought that defendant might be operating a nursing home in violation of her agreement. Plaintiffs thereupon

wrote defendant demanding that such suspected activity be discontinued. Defendant in reply denied any breach of covenant and invited plaintiffs to inspect her establishment, an invitation which plaintiffs declined. This course of action was later repeated on two other occasions during defendant's residence at 1007 Delaware Avenue and 1900 Washington Street in Wilmington. Defendant contends that plaintiffs, having declined to accept her invitation to see for themselves at other locations, may not now complain of her activities at The Delawarean.

Assuming but not deciding that a thorough and unrestricted inspection by plaintiffs of establishments operated by defendant prior to the opening of The Delawarean would have disclosed a breach of covenant on defendant's part, I do not believe that inaction on the part of plaintiffs misled defendant or caused her in any way to change her position to her detriment. On each occasion when plaintiffs suspected competition on defendant's part, she was notified and a demand was made for a cessation of suspected activity. Accordingly, defendant could not have reasonably assumed that plaintiffs had abandoned their rights under the covenant. The opposite should have been apparent, namely that plaintiffs were insisting on strict contractural compliance on defendant's part.

The mere passage of time without action by a plaintiff unattended by other factors calculated to prejudice a defendant does not constitute laches, *Scotton v. Wright, supra*. In the case at bar on each occasion which plaintiffs suspected defendant of competing in violation of her covenant, defendant not only denied any wrongful act but thereafter moved her place of residence before plaintiffs had a full opportunity to reach a decision on a course of action. Suspecting that defendant was concealing something, they were understandably wary of defendant's invitation to make a supervised inspection. Finally, I am not satisfied that defendant after 1948 actually operated a nursing home prior to the opening of The Delawarean and damages are sought only from such date in 1955. Under these circumstances it would be inequitable to hold that the plaintiffs delayed too long in bringing their action. As stated in *Scotton v. Wright, supra*:

"While as against even a wrongdoer the aggrieved party may not himself work an injury, yet he is not to be held to a strict and hard punctiliousness in saving the offender from the consequences of his own wrong. The complainants had a right to take a reasonable amount of time to observe the nature of the business the defendants were going to pursue, to witness for a reasonable time its effect upon their own business, and to deliberate upon the course they should pursue."

It remains to be decided what relief should be granted plaintiffs under the facts as proved. The complaint asks that the defendant be enjoined from continuing to conduct her present business in violation of her covenant, that she be made to account as to profits and to pay damages arising out of her breach.

■ A covenant restricting competition even when made in connection with the sale of a business and good will will be enforced only to the extent necessary to protect the legitimate interests of the buyer and may by judicial ruling be confined to a narrower sphere than actually contracted for, Vol. 5 *Williston on Contracts* (Rev.Ed.) § 1660. Compare *John Roane, Inc., v. Tweed*, 33 *Del.Ch.* 4, 89 *A.2d* 548, 41 *A.L.R.2d* 1. The covenant here sought to be specifically enforced was made on October 7, 1948 effective for a period of ten years. Less than a year remains in which defendant will remain under restraint from competing freely with plaintiffs in the nursing home business. May plaintiffs insist that defendant now be enjoined?

It is apparent from the record that plaintiffs' business enjoyed a steady growth from the date of its sale to plaintiffs until 1955 and that the need for injunctive relief to protect such business from competition by defendant at this late date is not in any sense compelling. Over the intervening years, plaintiffs have necessarily ceased to depend to any recognizable extent upon the good will of the Tull Sanitarium as it existed in October 1948. By their own efforts they have established a good will for their own business for which they adopted the name Rest Haven shortly after the 1948 purchase.

It is established that a preliminary injunction should not issue unless it appears that the plaintiff will suffer irreparable injury, should such relief not be granted, *Bayard v. Martin,* 34 *Del. Ch.* 184, 101 *A.2d* 329. On the other hand, after final hearing of a suit for injunctive relief, the trial court should not be concerned with the convenience of the parties as at that point the preservation of the status quo is no longer a proper matter for judicial consideration, *Richard Paul, Inc., v. Union Improvement Co.,* 33 *Del.Ch.* 113, 91 *A.2d* 49. Such factors as the hardship on defendant as compared to the benefit to plaintiff which might be expected to follow the granting of a preliminary injunction are necesarily matters to be weighed on a motion for such relief. Where, however, plaintiff has at trial established a clear legal right to an injunction, he should normally receive what he has prayed for, assuming he has done equity and not misled his opponent, and as noted above, I have absolved plaintiffs from the charge of laches.

Nonetheless, in the present case we are not dealing with a precise immutable right but with the more flexible problem of a restrictive covenant the original purpose of which was to bar defendant for a limited period from being active in the same type of business she had sold to plaintiffs. While I have held that there is no basis in law or fact for a successful attack on Mrs. Tull's original agreement to divorce herself from such business for a reasonable period in a limited area, particularly as a sale was involved, and it would seem to follow that had plaintiffs acted in years past they would have been entitled on necessary proof to a permanent injunction, yet, at this late date what purpose would a permanent injunction serve?

The record discloses that plaintiffs, notwithstanding some loss of earnings in recent years, have firmly established their own business under the name Rest Haven. Net earnings rose from $5,357.54 in 1949 to a high of $15,770.91 in 1954. The Tull covenant will expire by its own terms in October of this year. To all intents and purposes such covenant has outlived its usefulness. The object initially sought to be served by the covenant should have long ago been achieved. If such is not the case, the chance has been lost.

An injunction against breach of a contract has been likened to a decree for specific performance and accordingly governed by the same principles in that relief may be granted or refused in the discretion of the court, *Glantz v. Willow Supply Co.,* 139 *N.J.Eq.* 523, 53 *A.2d* 346. I believe that under the circumstances of this case there is discretionary power in the Court to grant or refuse a permanent injunction, and I am firmly of the opinion that to grant one now would not serve to implement the parties' agreement and would at the least inconvenience innocent third parties. Accordingly, I decline to enforce defendant's covenant specifically. There is precedent in this Court for not subjecting a defendant to a harsh application of a strict right in plaintiff, *Town of Seaford v. Eastern Shore Public Service Co.,* 22 *Del.Ch.* 92, 194 *A.* 92.

Plaintiffs, however, are entitled to such damages as the record discloses. The total of the damages sustained is in dispute, defendant contending they are at the most nominal, while plaintiffs seek damages in an amount in excess of $10,000. Such damages, if any, are clearly unliquidated in character and may more appropriately be determined by a jury than by the Court.

In the leading case of *Scotton v. Wright, supra,* which as noted above, was concerned with a restrictive covenant given in connection with the purchase of a business, the Chancellor in considering the issue of damages, stated:

> "In the case before me, the damages range from a nominal sum to as high as twelve thousand dollars, which is the sum contended for by the complainants. They are typically unliquidated in character. Being such they fall peculiarly within the province of a jury to ascertain * * *

> "The matter of the ascertainment of damages, of the kind here sought to be awarded, ought not to be passed upon by the Chancellor alone, unaided by the assistance of a jury, nor by a master. I am persuaded that the wise course to pursue is to seek the judgment of a jury at the bar of the Superior Court upon the question of the amount of damages."

The plaintiffs' application for injunctive relief is denied and an issue on the matter of damages may be framed for determination by a jury.